**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

SIERRA CLUB

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and ROBERT PERCIASEPE, Acting Administrator, United States Environmental Protection Agency,

Respondents.

Nos. 12-3169, 12-3182, and 12-3240

# PETITIONER'S OPENING BRIEF


LAW OFFICE OF ROBERT UKEILEY
Robert Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-502
rukeiley@igc.org

MCGILLIVRAY WESTERBERG & BENDER LLC
David C. Bender
Christa O. Westerberg
211 S. Paterson Street, Suite 320
Madison, WI 53703
Tel. 608.310.3560

## FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

Sierra Club has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

FRAP 26.1 CORPORATE DISCLOSURE STATEMENT…… ............................. ii

TABLE OF AUTHORITIES .....................................................................v

GLOSSARY OF TERMS………….. .....................................................ix

STATEMENT REQUESTING ORAL ARGUMENT ..........................................1

JURISDICTIONAL STATEMENT .......................................................1

A. AGENCY'S JURISDICTION .......................................................1

B. COURT OF APPEAL'S JURISDICTION ..............................................1

C. FILING DATE ESTABLISHING THE TIMELINESS OF THE PETITION FOR REVIEW .......................................................1

D. FINAL AGENCY ACTION .......................................................3

ISSUES PRESENTED FOR REVIEW .......................................................3

STATEMENT OF THE CASE .......................................................43

STATEMENT OF THE FACTS .......................................................4

I. BACKGROUND ON RELEVANT CLEAN AIR ACT REGULATORY STRUCTURE .......................................................4

II. FACTUAL BACKGROUND .......................................................7

STANDARD OF REVIEW .......................................................18

SUMMARY OF ARGUMENT .......................................................19

ARGUMENT .......................................................20

I. SIERRA CLUB HAD STANDING BECAUSE ITS MEMBERS ARE HARMED BY PM2.5 POLLUTION IN THE CINCINNATI AREA ........ 20

II. EPA ERRED BY DETERMINING THAT EMISSIONS FROM MAJOR POLLUTION SOURCES IN THE NONATTAINMENT AREA, WHICH CAN INCREASE AT ANY TIME UNDER A "CAP AND TRADE" PROGRAM, QUALIFY AS PERMANENT AND ENFORCEABLE REDUCTIONS IN EMISSIONS UNDER 42 U.S.C. § 7407(d)(3)(E)(iii) ........ 24

III. EPA VIOLATED THE REQUIREMENT OF 42 U.S.C. § 7407(d)(3)(E)(ii) TO ONLY REDESIGNATE AREAS TO ATTAINMENT IF THEY HAVE A FULLY APPROVED STATE IMPLEMENTATION PLAN WHEN THE IMPLEMENTATION PLANS FOR OHIO AND INDIANA DID NOT HAVE ANY REASONABLY AVAILABLE CONTROL TECHNOLOGY (RACT) EMISSION LIMITS REQUIRED UNDER THE CLEAN AIR ACT ........ 33

CONCLUSION ........ 39

CERTIFICATE REGARDING WORD LIMITATION ........ 41

CERTIFICATE OF SERVICE ........ 42

ATTACHMENTS

## TABLE OF AUTHORITIES

**Cases**


*Ailor v. City of Maynardville*,
368 F.3d 587 (6th Cir. 2004) ....................................................................20

*American Canoe Association, Inc. v. City of Louisa Water & Sewer Commission*,
389 F.3d 536 (6th Cir. 2004) ....................................................................21

*Am. Farm Bureau Fed'n v. E.P.A.*,
559 F.3d 512 (D.C. Cir. 2009) ....................................................................9

*Am. Trucking Association v. US EPA*,
175 F.3d 1027 (D.C. Cir. 1999) ....................................................................24

*Big Rivers Electric Corporation v. EPA*,
523 F.2d 16 (6th Cir. 1975)....................................................................4, 5, 36

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ....................................................................18

*Delaware Valley Citizens Council for Clean Air v. Davis*,
932 F.2d 256 (3rd Cir. 1991)....................................................................5, 36, 37

*EME Homer City Generation, L.P. v. EPA*,
696 F.3d 7 (D.C. Cir. 2012) ....................................................................25, 29

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*,
528 U.S. 167 (2000) ....................................................................21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 112 S. Ct. 2130 (1992)....................................................................20, 21

*Michigan v. EPA*,
213 F.3d 663 (D.C.Cir. 2000) ....................................................................14

*Natural Resources Defense Council v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009)......................13, 19

*Natural Resources Defense Council v. EPA*,
706 F.3d 428 (D.C. Cir. 2013) ......................8, 11, 20, 39

*North Carolina v. EPA*,
531 F.3d 896 (D.C.Cir. 2008) ......................13, 19, 28

*North Carolina v. TVA*,
593 F.Supp.2d 812 (W.D.N.C. 2009) ......................9

*Pennsylvania DEP v. EPA*,
932 F.2d 269 (3rd Cir. 1991) ......................5

*Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*,
468 U.S. 137 (1984) ......................18

*Sierra Club v. Johnson*,
436 F.3d 1269 (11th Cir. 2006) ......................21

*Sierra Club v. TVA*,
592 F.Supp.2d 1357 (N.D. Al. 2009) ......................9

*Southwestern Pa. Growth Alliance v. Browner*,
144 F.3d 984 (6th Cir.1998) ......................18

*Wall v. EPA*,
265 F.3d 426 (6th Cir. 2001) ......................*passim*

*Whitman v. American Trucking Association*,
531 U.S. 457 (2001) ......................24

**Federal Statutes**

5 U.S.C. § 706(2)(A) ......................17

42 U.S.C. § 7407(d)(1) ......................4

42 U.S.C. § 7407(d)(3)(D) ....... 1, 3

42 U.S.C. § 7407(d)(3)(E) ....... *passim*

42 U.S.C. § 7409(b) ....... 4

42 U.S.C. § 7410 ....... 6

42 U.S.C. § 7410(a) ....... 5, 26, 27, 32

42 U.S.C. § 7410(k) ....... 1, 5, 6, 32

42 U.S.C. § 7502(b) ....... 32

42 U.S.C. § 7502(c) ....... *passim*

42 U.S.C. § 7505a ....... 6

42 U.S.C. § 7511a(b)(2) ....... 34

42 U.S.C. § 7513a ....... 5, 6

42 U.S.C. § 7607(b) ....... 1

42 U.S.C. § 7607(b)(1) ....... 1, 2

**Federal Regulations**

40 C.F.R. § 51.1010(b) ....... 39

**Federal Register**

53 Fed. Reg. 34,791 (Sept. 8, 1988) ....... 37

61 Fed. Reg. 19,193, 19,196 (May 1, 1996) ....... 37

62 Fed. Reg. 38,652, 38,653 (July 18, 1997) ....... 8

70 Fed. Reg. 944 (Jan. 5, 2005) ....................................................................9

70 Fed. Reg. 65,983, 65,988 (Nov. 1, 2005) ...........................................................9

71 Fed. Reg. 2620, 2635 (Jan. 17, 2006) ...............................................................10

72 Fed. Reg. 20,586 (Apr. 25, 2007) ........................................................................8

75 Fed. Reg. 22,896, 22,900 (Apr. 30, 2010) ..........................................................8

76 Fed. 64,458, 65,464 - 65,465 (Oct. 21, 2011) ....................................................24

76 Fed. Reg. 77,903, 77,908 (Dec. 15, 2011) ................................................1, 3, 16

76 Fed. Reg. 80,253 (Dec. 23, 2011) ............................... 2, 3, 16, 27, 28-31, 33, 38

78 Fed. Reg. 3,086 (Jan. 15, 2013) ........................................................................17

**Other Sources**

US EPA Memorandum, April 21, 1983 Re: Section 107 Designation Policy ..........6

Letter from Gina McCarthy, EPA, to Hon. Fred Upton, U.S. House of Representatives (Feb. 3, 2012) ........................................................................10

## GLOSSARY

| | |
|---|---|
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CSAPR | Cross State Air Pollution Rule, also known as the Transport Rule |
| EGU | Electric Generating Unit |
| EPA | United States Environmental Protection Agency |
| NAAQS | National ambient air quality standard |
| NOx | Nitrogen Oxides |
| Ohio EPA | Ohio Environmental Protection Agency |
| PM | Particulate Matter |
| PM2.5 | Particulate Matter less than 2.5 microns in diameter |
| $SO_2$ | Sulfur Dioxide |

## STATEMENT REQUESTING ORAL ARGUMENT

Sierra Club requests oral argument in this case. Although the Court has addressed a very similar issue to one of the two issues presented in this appeal, oral argument may help clarify the Clean Air Act provisions at issue that are infrequently litigated.

## JURISDICTIONAL STATEMENT

### (A) AGENCY'S JURISDICTION

The United States Environmental Protection Agency (EPA) was statutorily authorized to take the two actions challenged in this direct appeal pursuant to 42 U.S.C. § 7407(d)(3)(D) and 42 U.S.C. § 7410(k)(2) & (3).

### (B) COURT OF APPEAL'S JURISDICTION

This Court has jurisdiction over this direct appeal of Clean Air Act final agency actions of EPA pursuant to 42 U.S.C. § 7607(b).

### (C) FILING DATE ESTABLISHING THE TIMELINESS OF THE PETITION FOR REVIEW

Notice of EPA's final action redesignating the Kentucky portion of the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter Nonattainment Area to attainment appeared in the Federal Register on December 15, 2011. 76 Fed. Reg. 77,903 (Dec. 15, 2011). The petition for review was due 60 days after notice appeared in the Federal Register, that is by February 13, 2012. 42 U.S.C. § 7607(b)(1); 76 Fed. Reg. at 77,908. Sierra Club filed its Petition for Review of the

Kentucky action which is Case 12-3169, on February 10, 2012. Thus, Case 12-3169 is timely filed.

Notice of EPA's action redesignating the Ohio and Indiana portion of the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter Nonattainment Area to attainment appeared in the Federal Register on December 23, 2011. 76 Fed. Reg. 80,253 (Dec. 23, 2011). The petition for review was due 60 days after notice appeared in the Federal Register, that is by February 21, 2012. 42 U.S.C. § 7607(b)(1); 76 Fed. Reg. at 80,260. Sierra Club filed its Petition for Review of the Ohio and Indiana action which is Case 12-3182, on February 15, 2012. Thus, Case 12-3182 (now consolidated into this case) was timely filed.

Sierra Club filed its Petition for Review of the same EPA action, related to Indiana, in the United States Court of Appeals for the Seventh Circuit on February 15, 2012.[1] The Seventh Circuit assigned this Case number 12-1343. Thus, Seventh Circuit case number 12-1343 was also timely filed. The Seventh Circuit transferred its case number 12-1343 to this Court, which assigned the transferred case number 12-3420 and consolidated it with 12-3169 and 12-3182.

[1] Sierra Club filed petitions for review of the same action in both this Court and the Seventh Circuit to preempt any potential procedural objections from EPA because EPA's same final action covered both Indiana, which is in the 7th Circuit, and Ohio, which is in this Circuit. The Clean Air Act assigns venue based on what area is covered by EPA's action. *See* 42 U.S.C. § 7607(b)(1).

**(D) FINAL AGENCY ACTION**

The rulemaking actions at 76 Fed. Reg. 77,903, 77,908 (Dec. 15, 2011) and 76 Fed. Reg. 80,253, 80,260 (Dec. 23, 2011) are final actions of the EPA Administrator.

## ISSUES PRESENTED FOR REVIEW

1) WHETHER EMISSIONS FROM MAJOR POLLUTION SOURCES IN THE NONATTAINMENT AREA WHICH CAN INCREASE AT ANY TIME UNDER A "CAP AND TRADE" PROGRAM QUALIFY AS PERMANENT AND ENFORCEABLE REDUCTIONS IN EMISSIONS UNDER 42 U.S.C. § 7407(d)(3)(E)(iii).

2) WHETHER EPA VIOLATED THE REQUIREMENT OF 42 U.S.C. § 7407(d)(3)(E)(ii) TO ONLY REDESIGNATE AREAS TO ATTAINMENT IF THEY HAVE A FULLY APPROVED STATE IMPLEMENTATION PLAN WHEN THE IMPLEMENTATION PLANS DID NOT HAVE REASONABLY AVAILABLE CONTROL TECHNOLOGY (RACT) EMISSION LIMITS REQUIRED UNDER THE CLEAN AIR ACT.

## STATEMENT OF THE CASE

This is a Clean Air Act direct appeal of two separate, but related, final agency actions of EPA redesignating the Kentucky portion and the Ohio and Indiana portions of the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter Nonattainment Area from a "nonattainment" designation to an in "attainment" designation pursuant to 42 U.S.C. § 7407(d)(3)(D). As part of EPA's redesignation process, EPA issued two separate proposed rules, one for the Kentucky portion and another for the Ohio and Indiana portion. Sierra Club submitted comments on each of these proposed rules. EPA rejected all of Sierra Club's comments and finalized its proposed redesignations in two separate final rules.

## STATEMENT OF THE FACTS

### I. BACKGROUND ON RELEVANT CLEAN AIR ACT REGULATORY STRUCTURE

At the heart of the Clean Air Act is Congress' requirement for health-protection-based minimum air quality standards, a listing of each area of the country failing to meet those standards, and the requirement that each non-attaining state develop specific and enforceable air pollution control programs to bring failing areas into compliance and ensure that they maintain compliance. Furthermore, this Court has explained that the "national policy is to reduce air

pollution." *Big Rivers Electric Corporation v. EPA*, 523 F.2d 16, 22 (6th Cir. 1975) (*Big Rivers*).

Congress mandated that the EPA establish national ambient air quality standards "requisite to protect the public health" with "an adequate margin of safety," as well as standards "requisite to protect the public welfare from any known or anticipated adverse effects." 42 U.S.C. § 7409(b). After establishing pollutant-specific ambient air quality standards, EPA must determine, while involving the states, which areas are attaining the ambient air standards and which are "nonattainment" areas. 42 U.S.C. § 7407(d)(1); *Wall v. EPA*, 265 F.3d 426, 428 (6th Cir. 2001). Once EPA has designated an area nonattainment, a state must submit a state implementation plan to meet <u>and maintain</u> the standard. 42 U.S.C. §§ 7410(a)(1), (2)(I), 7502(c), 7513a; *Wall*, 265 F.3d at 429; *Big Rivers*, 523 F.2d at 21. Air quality standards are not a target that is to be hit only once; they are the ceiling that a state must always stay below at all times through enforceable pollution limits. "The need to maintain the Clean Air Act standards once they are reached is well-recognized by the Courts. *See Train v.Natural Resources Defense Council, Inc.*, 421 U.S. 60, 99, [](1975); *United States Steel Corp.*, 633 F.2d at 674. These standards cannot be maintained unless the measures taken to achieve them are enforceable." *Pennsylvania DEP v. EPA*, 932 F.2d 269, 272 (3rd Cir. 1991).

Ambient pollution levels are constantly changing and are influenced by random factors, such as economic cycles and weather, in addition to the pollution allowed by enforceable emission limits. It is critical to the system of air pollution control that states' plans include adequate pollution limits to always maintain the air quality below the ceiling set by each standard. Sierra Club and EPA jointly made this very argument to the Third Circuit in *Delaware Valley Citizens Council for Clean Air v. Davis*, 932 F.2d 256, 267 (3rd Cir. 1991). *See also* US EPA Memorandum, April 21, 1983 Re: Section 107 Designation Policy (noting that areas may have to stay designated nonattainment despite monitoring data not showing violations in light of "current economic downturn.").[2] EPA reviews each state's plan and approves or disapproves the plan. 42 U.S.C. § 7410(k)(2), (3). At a minimum, EPA must ensure that each plan for a nonattainment area includes emission limits based on reasonably available control technology and permitting requirements for new and modified facilities. 42 U.S.C. § 7502(c)(1), (5). *See also* 42 U.S.C. § 7513a(a)(1)(C) (requiring reasonable available control measures which should includes RACT). RACT, despite its name, is not a "technology," but is actually an emission limit set to limit air pollution from existing sources of air pollution in nonattainment areas.

[2] Available at http://www2.epa.gov/laws-regulations/significant-guidance-documents-office-oar.

A state with nonattainment areas has the option of seeking a redesignation of a non-attainment area to attainment area status. But redesignation from nonattainment to attainment status is based on more than just air quality readings. Rather, the Clean Air Act requires a nonattainment area to satisfy five criteria to qualify for redesignation:

(1) EPA must have determined that the area attained the national ambient air quality standard;

(2) EPA has fully approved the applicable implementation plan for the area under 42 U.S.C. § 7410(k);

(3) "[T]he improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions";

(4) EPA has fully approved a plan sufficient to ensure continuous maintenance of air quality in the area below the ambient air standard ceiling (the "maintenance plan") by meeting the requirements of 42 U.S.C. § 7505a; and

(5) The State meets all requirements applicable to the area under 42 U.S.C. § 7410 and part D of Clean Air Act Subchapter I.

42 U.S.C. § 7407(d)(3)(E). Criteria 2 and 3 are at issue in this case. A nonattainment area can only be redesignated as an attainment area if each of these criteria is met.

## II. FACTUAL BACKGROUND

> "Particulate matter is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes." The particles "originate from a variety of anthropogenic stationary and mobile

> sources as well as from natural sources" and "may be emitted directly or formed in the atmosphere by transformations of gaseous emissions such as sulfur oxides (SOx), nitrogen oxides (NOx), and volatile organic compounds (VOC)." National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,653 (July 18, 1997).

*Natural Res. Def. Council v. EPA*, 706 F.3d 428, 429 ftnt 2 (D.C. Cir. 2013).

On July 18, 1997, EPA strengthened the particulate matter national ambient air quality standard (*i.e.*, the air pollution ceiling) by creating an annual standard for particulate matter less than 2.5 microns in diameter (PM2.5) of 15 micrograms per cubic meter (ug/$m^3$), compliance with which would be based on a three year average. 62 Fed. Reg. 38,652 (July 18, 1997). EPA determined that lower pollution ceilings for PM2.5 are necessary because of "evidence from numerous health studies demonstrating that serious health effects are associated with exposures to elevated levels of PM2.5." PM2.5 Implementation Rule, 72 Fed. Reg. 20,586 (Apr. 25, 2007; *see also id*. at 20,586-87 ("Epidemiological studies have shown statistically significant correlations between elevated PM2.5 levels and premature mortality. Other important effects associated with PM2.5 exposure include aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions, emergency room visits, absences from school or work, and restricted activity days), changes in lung function and increased respiratory symptoms, as well as new evidence for more subtle indicators of cardiovascular health. Individuals particularly sensitive to PM2.5 exposure include

older adults, people with heart and lung disease, and children."); 75 Fed. Reg. 22,896, 22,900 (Apr. 30, 2010) (EPA has determined that, "Both ozone and PM2.5 are associated with serious public health problems, including premature mortality…"); *Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 515 (D.C. Cir. 2009) ("Studies have demonstrated that both fine and coarse PM can have negative effects on public health and welfare. For example, each is associated with increased mortality (premature death) rates and morbidity (illness) effects such as cardiovascular disease and decreased lung function.").

It is important to understand that the 15 $ug/m^3$ standard for PM2.5 does not mean that people do not get sick or die when the three year average is below this level. Rather, the 1997 standard was a policy choice by EPA to reduce "aggregate population risk[.]" 62 Fed. Reg. 38,652, 38,671 (July 18, 1997). EPA and the courts have acknowledged that the science firmly establishes that there is <u>no level</u> of PM2.5 below which individuals will be safe from being killed or suffering other adverse health outcomes. *See e.g. North Carolina v. TVA*, 593 F.Supp.2d 812, 822 (W.D.N.C. 2009) *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010) (finding in a tort case against coal-fired power plants that "Court finds that, at a minimum, there is an increased risk of incidences of premature mortality in the general public associated with $PM_{2.5}$ exposure, even for levels at or below the NAAQS standard of 15 [u]g/m $^3$."); *Sierra Club v. TVA*, 592 F.Supp.2d 1357, 1371 (N.D. Al. 2009)

(holding that "there is no level of primary particulate matter concentration at which it can be determined that no adverse health effects occur."); 70 Fed. Reg. 65,983, 65,988 (Nov. 1, 2005) ("emissions reductions resulting in reduced concentrations below the level of the standards may continue to provide additional health benefits to the local population."); 71 Fed. Reg. 2620, 2635 (Jan. 17, 2006) (US EPA unable to find evidence supporting the selection of a threshold level of $PM_{2.5}$ under which the death and disease associated with $PM_{2.5}$ would not occur at the population level). Thus, the 15 $ug/m^3$ standard for PM2.5 that EPA set in 1997 is not a "safe" level of air pollution—it is a level EPA used for regulatory purposes in an attempt to begin reducing dangerous PM2.5 levels. Indeed, EPA' Assistant Administrator for air quality recently reiterated in a letter to Congress that there is no threshold of PM2.5 pollution in the ambient air that is considered safe:

> Studies demonstrate an association between premature mortality and fine particle pollution at the lowest levels measured in the relevant studies, levels that are significantly below the NAAQS for fine particles. These studies have not observed a level at which premature mortality effects do not occur. The best scientific evidence, confirmed by independent, Congressionally-mandated expert panels, is that there is no threshold level of fine particle pollution below which health risk reductions are not achieved by reduced exposure. Thus, based on specific advice from scientific peer-review, we project benefits from reducing fine particle pollution below the level of the NAAQS and below the lowest levels measured in the studies.

Letter from Gina McCarthy, EPA, to Hon. Fred Upton, U.S. House of Representatives (Feb. 3, 2012).[3]

On January 5, 2005, the EPA published its initial nonattainment areas designations for the 1997 PM2.5 standards. 70 Fed. Reg. 944 (Jan. 5, 2005). In that rulemaking, EPA designated the Cincinnati-Hamilton, area as nonattainment (for Ohio: Butler, Clermont, Hamilton, and Warren Counties, Ohio; for Indiana: a portion of Dearborn County, and for Kentucky: Boone, Campbell, and Kenton Counties). Modifications to those designations were made and an effective date was set at April 5, 2005.

The CAA, as interpreted by EPA at the time, required states with PM2.5 nonattainment areas to submit a plan within three years of the effective date of the designations (April 5, 2008) detailing how the PM2.5 standards will be attained by April 5, 2010. Ohio Submittal at 2 [App. 66]. As a result of the 2005 PM2.5 designations, because "Ohio's main PM2.5 components are primary particles (organic carbon, crustal material, and elemental carbon), $SO_2$ and NOx," Ohio Submittal at 2 [App. 66], Ohio EPA was required to develop a plan to reduce oxides of nitrogen (NOx), sulfur dioxide ($SO_2$) as well as direct PM2.5 emissions and to demonstrate that the area will meet the federal annual air quality standard by April 5, 2010. *Id.* $SO_2$ and NOx are PM2.5 precursors. They are emitted as gases

[3] Available at http://switchboard.nrdc.org/blogs/jwalke/2-3-12%20EPA%20letter%20to%20Upton%20re%20PM%20benefits.pdf.

from pollution sources such as coal-burning power plants and cars and in the air undergo chemical reactions that transform them into various types of PM2.5 such as nitrates and sulfates. *Natural Res. Def. Council*, 706 F.3d at 429 ftnt 2.

Ohio explained in its redesignation request submittal that a “significant portion of the improved air quality can be attributed to . . . “the regional reductions associated with the NOx Trading Program[.]” Ohio EPA December 9, 2010 PM2.5 redesignation request for the 1997 PM2.5 Annual Standard for the Cincinnati-Hamilton Area (Ohio Submittal) at First page [App. 57].

CAIR, the Clean Air Interstate Rule, subjects coal-burning power plants to a cap and trade program for NOx and $SO_2$ emissions. *North Carolina v. EPA*, 531 F.3d 896, 903-05, 907 (D.C. Cir. 2008). “Cap and trade” means that individual pollution sources are not subject to specific emission limits. Rather that is a total amount of pollution allocated to a group of pollution sources. Each source is allocated pollution credits. Each source can only emit as much pollution as it has credits for. However, sources are allowed to trade their credits. *North Carolina*, 531 F.3d at 907 (“In CAIR's trading system, states are given initial emissions budgets, but sources can choose to sell or purchase emissions credits from sources in other states. As a result, states may emit more or less pollution than their caps would otherwise permit.”). Thus, for example, a power plant in Hamilton County, Ohio could be allocated credits to emit 1000 tons of NOx per year. However, if

the power plant in Hamilton County, Ohio, wants to to emit 2000 tons of NOx in a particular year, it can purchase another 1000 tons of credits from a power plant all away across the state in Lake County, Ohio. But both of those counties are not in the Cincinnati nonattainment area, so both do not contribute equally to air pollution in Cincinnati; the Lake County power plant pollution may not contribute to air quality in Cincinnati at all. Increasing emissions from plants actually located in the nonattainment area will not be offset by decreasing pollution by an equal amount from a plant 250 or more miles away. And most cap and trade programs are not limited to intrastate trading. For example, under the Acid Rain cap and trade program of Title IV of the Clean Air Act, a source in Hamilton County, Ohio can obtain additional pollution credits from a source all the way in Washington State. The NOx SIP Call and CAIR also allow interstate trading among many states across the eastern United States, with some minor restrictions. *Natural Resources Defense Council v. EPA*, 571 F.3d 1245, 1255-56 (D.C. Cir. 2009). Therefore, a plant contributing to air pollution in Cincinnati could buy allowances from a plant in an upwind state that does not contribute to air pollution in Cincinnati, which does not increase pollution nation-wide, but certainly increases it in the area directly causing the pollution in Cincinnati. *See e.g., North Carolina*, 531 F.3d at 907 (no requirement that the pollution sources in one state, contributing to a particular downwind state's non-attainment, reduce emissions at

all due to the ability to buy allowances); *Michigan v. EPA*, 213 F.3d 663, 679 (D.C.Cir. 2000) (noting that EPA concedes that plants within different states will contribute differently to a particular nonattainment area). Moreover, trading programs allow emission banking. So, a plant can run less in one year, or in multiple years, and save up its allowances to pollute more in a subsequent year.

On February 1, 2008, U.S. EPA approved Ohio's CAIR program, which can be found in Ohio Administrative Code (OAC) Chapter 3745-109. Ohio Submittal at 6 [App 70]. However, EPA has never approved any PM2.5 RACT rules for the Cincinnati-Hamilton area.

Ohio relied on ambient monitoring data from 2007 – 2009 in its redesignation request. Ohio Submittal at 11 [App 75]. Of course, 2009 was the beginning of the Great Recession.[4]

There are numerous coal-burning power plants, known as Electric Generation Units (EGUs) in Clean Air Act lingo, in the Cincinnati-Hamilton nonattainment area. These include Miami Fort, Zimmer, Beckjord, Hamilton, Tanners Creek, and East Bend. Ohio EPA explained: "Ohio EPA is identifying emissions projections for 2015 and 2021 for EGUs with implementation of the CAIR program." Ohio Submittal at 25 [App 89]. That is, Ohio's submission

[4] One of the ambient pollution monitors in the nonattainment area had a design value of 15.0 ug/m$^3$ which is the NAAQS. *Id.* However, EPA only considers a violation of the NAAQS to be 15.1 ug/m$^3$ or greater.

seeking redesignation assumed that the CAIR program would result in specific maximum emissions from these EGUs.

Ohio's redesignation submittal was also based on ambient air quality data from 2007 to 2009. 2009 was the first year in which the CAIR NOx trading program first applied. OAC 3745-109-04. However, CAIR actually also impacted ambient pollution levels in 2007 and 2008, even before its cap and trade program officially began. This is because CAIR also offered early reduction credits which provided an incentive for power plants to reduce their NOx emissions in 2007 and 2008 but that incentive went away in 2009. *See* OAC 3745-109(D).

Furthermore, prior to CAIR, the NOx SIP Call cap and trade program was in place and continued to remain in place after CAIR was remanded by the D.C. Circuit. Ohio Submittal at 26 [App. 90]. Ohio readily admitted in its submission that power plants began reducing their emission of PM2.5 precursor pollutants in 2008 and 2009 pursuant to the cap and trade CAIR rule, rather than pursuant to any specific emission limits in the SIP that would require the same level of emissions year in and year out. *Id.*[5] Ohio EPA concluded "Ohio EPA is in agreement with the analysis by U.S.EPA that the CAIR program is providing real reductions at this

[5] Two other factors that lead to lower emissions and thus improvements in air quality to a level below the NAAQS, according to Ohio, were electric demand decline, which one was due to the Great Recession, and low nature gas prices, which is obviously subject to significant fluctuation. Ohio Submittal at 26 [App. 90].

time,[meaning 2009 – 2010] Ohio believes these reductions have assisted with PM2.5 attainment in this nonattainment area[.]" Ohio Submittal at 27 [App. 91]

Ohio's request for redesignation was premised, in significant part, on Ohio's claim that the measured decrease in PM2.5 concentrations was due to reductions from a combination of interstate trading programs and a settlement "consent decree" in Clean Air Act enforcement cases covering some EGUs:

> Permanent and enforceable reductions of PM2.5, NOx, and SO2 emissions have contributed to the attainment of the annual PM2.5 standard. Some of these reductions were due to the application of tighter federal standards on new vehicles. Also Title IV of the CAA, the NOx SIP Call, CAIR, and federal consent decrees required the reductions of SO2 and NOx emissions from utility sources.

Ohio Submittal at 39 [App 103]. Ohio was therefore relying on trading programs--Title IV of the CAA, the NOx SIP Call and CAIR—and at least one consent decree that includes a cap and trade program covering multiple plants. *See United States v. AEP*, 99-1250 *et al.*, (S.D. Ohio) Dk # 363 and 370, Consent Decree at page 19.

On December 15, 2011, EPA published notice redesignating the Kentucky portion of the Metro-Cincinnati 1997 annual fine particulate matter (PM2.5) nonattainment area to attainment. 76 Fed. Reg. 77,903 (Dec. 15, 2011). On December 23, 2011, EPA published notice redesignating the Ohio and Indiana portion of the Metro-Cincinnati 1997 annual fine particulate matter nonattainment area to attainment. 76 Fed. Reg. 80,253 (Dec. 23, 2011).

On January 15, 2013, EPA published notice in the Federal Register that it had lowered the annual fine particulate matter national ambient air quality standard down from the 15 micrograms per cubic meter of the 1997 NAAQS to 12 micrograms per cubic meter. *See* 78 Fed. Reg. 3,086 (Jan. 15, 2013). EPA lowered the standard, that is, made it more protective, so "as to provide increased protection against health effects associated with long- and short-term exposures (including premature mortality, increased hospital admissions and emergency department visits, and development of chronic respiratory disease)[.]" *Id.* Put bluntly, EPA lowered the standard because it decided too many innocent people were being killed or injured by the inadequate 1997 standard at issue in this case. The Cincinnati area is currently violating the 2013 annual fine particulate matter ambient air quality standard. Wall Dec. at ¶15 (attached hereto as Attachment 2). *See also* 76 Fed. Reg. at 77,905 (7 monitors in Metro-Cincinnati have 2008-2010 three year average above the 2013 standard of 12 $ug/m^3$). Yet, no regulatory actions are currently being taken to specifically reduce the level of fine particulate matter in the Cincinnati area. Past experience shows that EPA and the states' regulatory lag will delay any action to implement the 12 $ug/m^3$ standard. Wall Dec. at ¶16. The fact that EPA may approve emission reductions years in the

future to implement the 2013 ambient air quality standard is no comfort to those injured or killed by fine particulate matter in the intervening years.[6]

## STANDARD OF REVIEW

A final action of the EPA will not be overturned unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Southwestern Pa. Growth Alliance v. Browner*, 144 F.3d 984, 988 (6th Cir.1998). The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute that it administers. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). If "Congress has directly spoken to the precise question at issue," *id.* at 842, then the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The court, however, must "reject administrative constructions ... that are inconsistent with the statutory mandate[.]" *Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 468 U.S. 137, 143, (1984) (citations omitted).

[6] The Cincinnati area is also designated nonattainment for the 2008 ozone NAAQS. NOx is a precursor to both ozone and PM2.5. EPA has recommended that part of the Cincinnati be designated nonattainment for the 2010 $SO_2$ NAAQS. *See* http://www.epa.gov/airquality/sulfurdioxide/designations/eparesp/04_KY_resp.pdf.

## SUMMARY OF ARGUMENT

EPA's redesignation of the Cincinnati-Hamilton PM2.5 nonattainment area to attainment status relies heavily upon emission reductions in the nonattainment area which are assumed to occur from cap and trade emission programs, including the NOx SIP Call and the Clean Air Interstate Rule (CAIR). But, cap and trade programs, by their very nature, do not ensure that pollution sources causing nonattainment air pollution in the Cincinnati area will never increase their emissions. Rather, the point of cap and trade programs is actually to allow any particular pollution source to increase its emissions anytime it wants, but puts a price on that increase (through the requirement to have or obtain allowance credits for the pollution). This choice is wholly incompatible with the Clean Air Act (CAA) mandate in 42 U.S.C. § 7407(d)(3)(E)(iii) emission reductions which helped an area attain the ambient air quality standard be permanent and enforceable. It was this ability of sources of pollution to increase their emissions under cap and trade programs which lead the D.C. Circuit to reject the use of CAIR as the required reasonably available control technology (RACT) emission limits required for nonattainment SIPs. *See Natural Res. Def. Council*, 571 F.3d at 1256-58. The ability for particular EGUs to avoid pollution reductions—and even to increase pollution—under trading programs is also the reason that the D.C. Circuit

rejected CAIR as incapable of ensuring reductions in contribution to particular downwind nonattainment areas. *North Carolina*, 531 F.3d at 907-08.

This Court has also previously ruled that EPA cannot redesignate an area to attainment until the area has reasonably available control technology (RACT) emission limits approved into its SIP. *Wall*, 265 F.3d at 442. Yet that is exactly what EPA did in this case. Ohio never adopted RACT pollution limits for PM2.5, but EPA approved redesignating the Cincinnati-Hamilton area as attainment anyway. EPA's justification, that it will implement RACT through Subpart 1 of Part D of the Clean Air Act, was recently struck down and therefore no longer provides a justification of EPA's action in this case. *See Natural Res. Def. Council*, 706 F.3d at 429.

## ARGUMENT

### I. SIERRA CLUB HAD STANDING BECAUSE ITS MEMBERS ARE HARMED BY PM2.5 POLLUTION IN THE CINCINNATI AREA

A plaintiff has standing under the Constitution when: (1) the plaintiff has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992); *Ailor v. City of Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004). Furthermore, environmental plaintiffs have standing when "they are use the

affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *American Canoe Association, Inc. v. City of Louisa Water & Sewer Commission*, 389 F.3d 536, 542 (6th Cir. 2004)(citations removed) (holding Sierra Club and others have constitutional standing to bring an environmental case on behalf of its members who had suffered an injury in fact to their aesthetic and recreational values).

In addition, a plaintiff can have standing when his or her procedural rights are threatened or frustrated. *Lujan*, 504 U.S. at 573 n.8; *Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006) (holding that Sierra Club has standing to challenge procedural omissions when granting a Title V air permit where the omissions "could have led to improvements in the [facility's] permit, which, in turn, could have reduced the harm caused by the air pollution emitted from the… plant").

Sierra Club has standing to bring this action on behalf of its members because it has members who have standing to sue in their individual capacity. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000); *American Canoe Association*, 389 F.3d at 540. Sierra Club's mission is to preserve protect and enhance the natural environment. Declaration of Nachy Kanfer In Support of Petition for Review (Kanfer Dec.) at ¶ 2 (Attachment 1, hereto).

In this case Sierra Club and its members have suffered an injury in fact because EPA has illegally redesignated the Cincinnati area to attainment of the 1997 annual PM2.5 standard. "More stringent air pollution control requirements apply to nonattainment areas than to attainment areas. *See* CAA §§ 171-86, 42 U.S.C. §§ 7501-15." *Wall*, 265 F.3d at 428. "A state may request the EPA to redesignate an area from nonattainment to attainment status if that area has improved in air quality. *See* 42 U.S.C. § 7407(d)(3)(D). After an area is so redesignated, it no longer need comply with the more stringent air pollution measures that apply only to nonattainment areas." *Wall*, 265 F.3d at 429. Thus, by redesignating the Cincinnati area to attainment, EPA removed the more stringent air quality protections that would otherwise apply.

Sierra Club's members live, work, and recreate in the Cincinnati-Hamilton 1997 PM2.5 nonattainment area. *See* Kanfer Dec. at ¶¶ 6 – 10; Wall Dec., at ¶¶ 2 – 6.[7] Sierra Club's members have reasonable concerns about the air pollution in the Cincinnati-Hamilton nonattainment area, the impact such pollution may have

[7] Marilyn Wall was also the petitioner in *Wall v. EPA*, 265 F.3d 426 (6th Cir. 2001), another case challenging an EPA redesignation of Cincinnati to attainment. Although not addressed explicitly, this Court must have found that Ms. Wall established standing because it did not dismiss the case for lack of jurisdiction. There is no relevant distinction between that case and this one.

on their health, and other aesthetic concerns. Wall Dec. at ¶¶ 7, 11. This satisfies Article III standing.[8]

Sierra Club and its members also have standing because EPA violated their procedural rights. By redesignating the Cincinnati-Hamilton area, EPA denied Sierra Club and its members the opportunity to participate in the nonattainment SIP process including the nonattainment new source review permitting process. These procedures could decrease the amount of pollution that injures Ms. Wall and other Sierra Club members in the Cincinnati-Hamilton area.

This Court can remedy the injury suffered by Sierra Club and its members by issuing an order vacating or remanding the nonattainment designation. For all of these reasons, Sierra Club has standing.

[8] In finding that Sierra Club's members' interests were fairly traceable to discharges of pollution to the Big Sandy River in Kentucky, the Sixth Circuit relied on the findings of the Fourth Circuit that "traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm to the plaintiffs. Rather, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Commission*, 389 F.3d 536 (6th Cir. 2004) (quoting *Piney Run Pres. Assn'n v. County Comm'rs of Carroll Country*, 268 F.3d 255, 263-64 (4th Cir. 2001) (internal quotation marks omitted)).

## II. EPA ERRED BY DETERMINING THAT EMISSIONS FROM MAJOR POLLUTION SOURCES IN THE NONATTAINMENT AREA, WHICH CAN INCREASE AT ANY TIME UNDER A "CAP AND TRADE" PROGRAM, QUALIFY AS PERMANENT AND ENFORCEABLE REDUCTIONS IN EMISSIONS UNDER 42 U.S.C. § 7407(d)(3)(E)(iii).

The third statutory criterion for redesignation requires that the improvement in air quality in the nonattainment area "is due to permanent and enforceable emission reductions." 42 U.S.C. § 7407(d)(3)(E)(iii). The D.C. Circuit has noted that this is a "stringent criteria[.]" *Am. Trucking Ass'n v. US EPA*, 175 F.3d 1027, 1047 (D.C. Cir. 1999), *rev'd on other grounds sub nom. Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001).

In its request for redesignation, Ohio claimed that improvements in air quality in the nonattainment area were due, in some non-quantified part, to the Acid Rain program of Title IV of the Clean Air Act, the NOx SIP Call, CAIR, and federal consent decrees which require reductions the PM2.5 precursors, $SO_2$ and NOx, from power plants. Ohio Submittal at 39 [App 103]. In EPA's proposed rule to redesignate the Kentucky portion, EPA explained that the "majority of the improvement in ambient PM2.5 concentrations has resulted from reductions in emissions from coal fired power plants." *Id.* Specifically, EPA listed the NOx SIP Call as one rule that obtained permanent and enforceable emission reductions which created improvements in air quality. 76 Fed. Reg. 64,458, 65,464 - 65,465

(Oct. 21, 2011) ("Emission reductions resulting from regulations developed in response to the NOx SIP Call are permanent and enforceable").

EPA also listed the CAIR and CSAPR trading programs. *Id.* The Cross State Air Pollution Rule (CSAPR), which is also referred to as the "Transport Rule," was EPA's replacement cap and trade program after the D.C. Circuit struck down CAIR. *See* 76 Fed. Reg. 48,208 (Aug. 8, 2011). EPA found that the CAIR and CSAPR cap and trade programs resulted in a significant portion of the pollution reduction resulting in the attainment of the 15 $ug/m^3$ air quality standard, as measured in recent years in the Cincinnati region, and that such reductions "are permanent and enforceable" as a result of the trading program. 76 Fed. Reg. at 65,464-65*; see also id.* at 65,466 (same). EPA said almost the exact same thing with regard to the Ohio and Indiana portion of the nonattainment area. *See* 76 Fed. Reg. 64,825, 64,829 –832 (Oct. 19, 2011).

EPA's conclusion that emission reductions resulted from the NOx SIP Call and CAIR, and could result from future compliance with CSAPR[9] are permanent and enforceable is baseless. Each of those programs is a cap and trade program. Any emissions reductions achieved through these could be lost through increases

[9] CSAPR has been vacated by the D.C. Circuit, so it generates no emission reductions, much less ones that are permanent and enforceable. *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012) *cert granted* June 24, 2013. However, even if reinstated by the Supreme Court, CSAPR will still be a cap and trade program which Sierra Club contends does not create permanent and enforceable emission reductions required under 42 U.S.C. § 7407(d)(3)(E)(iii). Thus, the outcome of the *Homer City* case in the Supreme Court does not dictate the outcome of this case.

allowed by purchasing or intra-company trading of emissions credits or by using emission credits “banked” from prior lower-emitting years. Any power plant that contributes to air pollution in the Cincinnati region could decide at any time in the future to obtain additional emission credits or spend banked emissions credits to increase its emissions. Those emission increases, and resulting pollution increases in the Cincinnati region, are not only allowed by the trading programs, but that flexibility to increase future emission is the raison d’être of trading programs. Thus, current emission rates for sources subject to CAIR and the NOx SIP Call are not permanent and not enforceable.

The D.C. Circuit Court recently held that EPA cannot use cap-and-trade programs to satisfy an area-specific statutory mandate. The court explained that:

> Even if most sources in a nonattainment area installed controls rather than purchasing allowances, a small number of sources purchasing allowances and increasing emissions could mean that overall emissions from sources in the area remained unchanged or even increased.

*NRDC v. EPA*, 571 F.3d 1245, 1257 (D.C. Cir. 2009). While the issue in the 2009 *NRDC* case was whether the cap and trade CAIR program could be used to meet the requirements of RACT in 42 U.S.C. § 7502(c)(1), the same statutory interpretation and logic applies to the present case. In the 2009 NRDC case, the court relied on the language in 42 U.S.C. § 7502(c)(1) that required RACT to be applied to sources “in the [nonattainment] area[.]” *NRDC*, 571 F.3d at 1256.

Similarly, 42 U.S.C. § 7407(d)(3)(E)(iii) requires that the permanent and enforceable reductions improve air quality in the nonattainment area which is the subject of the redesignation request. But a cap and trade program cannot meet this requirement for either 42 U.S.C. § 7502(c)(1) or 42 U.S.C. § 7407(d)(3)(E)(iii). In both cases, sources of pollution *in the nonattainment area* or which have led to improvements in the air quality *in the nonattainment area* can legally choose to increase their pollution emissions at any time in the future by purchasing allowances, using banked allowances, or otherwise obtaining allowances under the cap and trade program. In that event, the D.C. Circuit held that the emissions would no longer be controlled to RACT levels. Similarly here, the emissions would no longer be the level that led to improvements in the air quality in the Cincinnati-Hamilton nonattainment area.

Ironically, the very case that invalided CAIR also confirms why CAIR and other cap and trade programs are not permanent and enforceable emission reductions. CAIR's legal roots are 42 U.S.C. § 7410(a)(2)(D)(i)(I), which requires states to ensure that pollution from their state will not significantly contribute to nonattainment in, or interfere with maintenance by, any downwind state. This parallels the requirement in 42 U.S.C. § 7407(d)(E)(iii) that reductions in pollution concentrations in the nonattainment area be caused by permanent and enforceable reductions from the pollution sources that were contributing to bad air quality in

the nonattainment area. Both involve a link between specific upwind sources and air quality in specific downwind areas. In *North Carolina*, downwind states argued that because CAIR was a cap and trade program, it could not ensure that emissions from one state would not contribute or nonattainment or interfere with maintenance in other states. 531 F.3d 896, 906-08 (D.C. Cir. 2008). Sources that had previously contributed to air quality problems in their downwind neighboring state could once again cause similar problems even after CAIR was implemented by obtaining additional emission allowances under CAIR's trading provisions. *Id.*

As with the language in 42 U.S.C. §§ 7407(d)(3)(E)(iii) and 7502(c)(1), the D.C. Circuit could not reconcile the concept of a cap and trade program that does not require any reduction from any particular pollution source with the requirement in 42 U.S.C. § 7410(a)(2)(D)(i)(I) that EPA eliminate pollution from sources "'within the State'" that contribute "to nonattainment or interfering with maintenance 'in any other State.'" *North Carolina*, 531 F.3d at 907. Similarly here, emission trading programs do not require any reductions from the plants upwind from Cincinnati, much less permanent and enforceable ones.

In its response to comments, EPA says that while some of the emission reductions under 42 U.S.C. § 7407(d)(3)(E)(iii) are from cap and trade programs, some are not. 76 Fed. Reg. at 80,255. This does nothing for EPA's cause because EPA does not claim and does not even try to prove that the emission reductions

from the non-cap and trade measures are sufficient to bring about the improvements in air quality, by themselves, to bring and keep the Cincinnati-Hamilton nonattainment area into attainment.

More to the point, EPA says that it disagrees that reductions from trading programs cannot be considered permanent and enforceable under 42 U.S.C. § 7407(d)(3)(E)(iii). 76 Fed. Reg. at 80,255. As the basis for this contention, EPA argues that, once implemented, CSAPR will be "firmly constraining any emission shifting that may occur by requiring a strict emission ceiling in each state (the budget plus variability limits)." *Id*.[10] That is, EPA contends that even if other trading programs do not ensure permanent and enforceable reductions, CSAPR will. However, EPA's response fails because CSAPR has been vacated. *EME Homer City Generation*, 696 F.3d at 7. And, even if the Supreme Court overturns that vacatur, the CSAPR would still not ensure that the particular air pollution sources upwind from Cincinnati achieve any emission reductions. More importantly, EPA totally ignores intrastate trading. EPA does not claim CSAPR prohibits intrastate trading. The rule specifically allows it. Thus, EPA completely fails to address the situation Sierra Club explains above, where a power plant in Hamilton County, Ohio can increase emissions after the redesignation to attainment by obtaining emission credits from another power plant in Lake County,

[10] EPA makes the same arguments in its response to comments regarding the Kentucky rule. *See* 76 Fed. Reg. at 77,906.

which is in the same state but some three hundred miles away. Nor does EPA's response to comments address a situation where a plant in Hamilton County idles and banks credits for several years when the wholesale price of electricity is low, but then spends those credits in a future year to increase pollution in the nonattainment area. In Kentucky, the problem with EPA's theory is even more apparent because not only is there significant distance between plants in the state, but there is also elevated terrain. Reducing pollution from plants east of the Appalachian mountains and using the then-available allowances to increase pollution from plants west of the Appalachian mountains can increase pollution in the Cincinnati area, but still comply with CSAPR.

EPA goes on to make a business case for why sources will not change their emissions under a cap and trade program after redesignation to attainment. 76 Fed. Reg. at 80,256. EPA is wrong about its business case. It ignores the reality that utilities are motived to spend capital on pollution controls because they earn a guaranteed rate of return on that capital but do not increase their earnings by operating the pollution control equipment. The reality is that regulated utilities are incentivized to build, but not to operate, pollution control equipment. In fact, there are many power plants that do not fully and continuous operate their installed pollution controls. However, at bottom, Sierra Club need not disprove EPA's business case speculation because the assumed behavior of a reasonable economic

actor in a hypothetical business case is not "permanent and enforceable," which is what the statute requires. 42 U.S.C. § 7407(d)(e)(3)(E)(iii). EPA even admits that the most it can say is that a plant is "almost certain" to operate its controls "effectively." 76 Fed. Reg. at 80,256. The Clean Air Act does not say anything about "almost certain" in this context. Rather, it says that the reductions in pollution that resulted in a nonattainment area measuring attainment must be "due to permanent and enforceable reductions in emissions". 42 U.S.C. § 7407(d)(3)(E)(iii).

EPA argued that if emissions increase at one source under CSAPR, they will decrease at another source under CSAPR. 76 Fed. Reg. at 80,256. Again, putting aside the fact that CSAPR is currently vacated, EPA offers no data or analysis to support this claim. The Clean Air Act calls for a "determination," not speculation. 42 U.S.C. § 7407(d)(3)(E)(iii).

Again, EPA ultimately admits the flaw in its own position. It admits that the corresponding emission reduction "will have an air quality benefit that will compensate **at least in part** for the impact of any increase from utility companies outside but near the Cincinnati-Hamilton area." 76 Fed. Reg. at 80,256 (emphasis added). However, EPA offers no explanation for why it is assuming that any increase in emissions from a source near the Cincinnati-Hamilton area would be compensated, even partially, by a decrease from a nearby source, rather than

entirely from reduced emissions from one or more plants far away from the Cincinnati-Hamilton area. There is no dispute that all of the cap and trade programs relied on by EPA allows for increases at the power plants in the Cincinnati-Hamilton area without any decrease from nearby plants.

More importantly, 42 U.S.C. § 7407(d)(3)(E)(iii) requires that the reductions resulting in air quality improvement be "permanent and enforceable," not that they be "compensate[d], at least in part." Nowhere does EPA claim that mere partial-compensation of increased emissions at the EGUs upwind from Cincinnati ensures that ambient air pollution concentrations in Cincinnati do not increase. In short, an emission increase that is only partly offset (by an unspecified percentage) is not "permanent and enforceable" by any reasonable definition of those terms.

Finally, EPA argues that maintenance plan required under 107(d)(3)(E)(iv) relieved of its obligations under 107(d)(3)(E)(iii). 76 Fed. Reg. at 80,256. However, the plaint language of the statute, with its use of the term "and" between the clauses, is clear that EPA must determine that an area meets all five of the criteria under 107(d)(3)(E) to be properly redesignated.

## III. EPA VIOLATED THE REQUIREMENT OF 42 U.S.C. § 7407(d)(3)(E)(ii) TO ONLY REDESIGNATE AREAS TO ATTAINMENT IF THEY HAVE A FULLY APPROVED STATE IMPLEMENTATION PLAN WHEN THE IMPLEMENTATION PLANS FOR OHIO AND INDIANA DID NOT HAVE REASONABLY AVAILABLE CONTROL TECHNOLOGY (RACT) EMISSION LIMITS REQUIRED UNDER THE CLEAN AIR ACT.[11]

Section 172(c)(1) of the Clean Air Act, 42 U.S.C. § 7502(c)(1), requires implementation plans for nonattainment areas to "provide for the implementation of all reasonably available control measures as expeditiously as practicable (including . . . reasonably available control technology)[.]" This requires that existing major pollution sources in nonattainment areas be required to comply with emission limitations based on the reasonable available control technology (RACT). *Id.* This requirement is not conditional or optional. It must be part of the plan that the nonattainment state submits to the EPA pursuant to 42 U.S.C. § 7410(a), 42 U.S.C. § 7502(b), and which the EPA must then approve within mandatory timelines. 42 U.S.C. § 7410(k). This is particularly relevant here, because EPA's approval of the nonattainment SIP, including RACT emission limits, was a precondition before EPA could redesignate the Cincinnati-Hamilton nonattainment area into attainment. 42 U.S.C. § 7407(d)(3)(E)(ii).

42 U.S.C. § 7407(d)(3)(E)(ii) prohibits EPA from redesignating an area to attainment unless EPA has "fully approved the applicable implementation plan for

---

[11] Kentucky's SIP also lacks PM2.5 RACT. However, Sierra Club acknowledges that this issue was not raised in the comments regarding Kentucky's redesignation.

the area under section 7410(k)[.]" There is no indication in the proposed redesignation, or elsewhere, that either Ohio or Indiana has approved RACT measures for the 1997 PM2.5 standard. EPA does not dispute that the Indiana and Ohio implementation plans lack RACT emission limits. Yet, EPA approved redesignation of the Cincinnati-Hamilton nonattainment area anyway.

EPA maintains that the RACT requirement for the pollution sources in the Cincinnati-Hamilton area evaporated once the air quality in the area first dropped below the ambient air quality ceiling, and therefore EPA could redesignate the area despite the missing RACT pollution limits. 76 Fed. Reg. at 64828. In response to comments, EPA again argued that because Cincinnati was attaining the 15 $ug/m^3$ standard at the time of the redesignation, RACT was not needed to attain the standard and therefore was not required. 76 Fed. Reg. at 80,258. EPA's theory lacks any statutory basis, and Courts have rejected it.

This Court concluded that "the EPA abused its discretion when it determined that it could redesignate the Cincinnati metropolitan area as achieving attainment before Ohio had fully adopted all of the RACT rules of Part D, Subpart 2, of the CAA." *Wall*, 265 F.3d at 442. The Court reasoned that "Congress clearly intended that actual provisions to require the implementation of RACT measures must be contained in SIPs submitted with respect to redesignation requests." *Id.* The same holds true in this case.

The fact that RACT in *Wall* was required by 42 U.S.C. § 7511a(b)(2) and RACT in this case is required by 42 U.S.C. § 74502(c)(1) makes no difference. In *Wall*, this Court required RACT be in the SIP prior to redesignation because the statute provides: "The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology." 42 U.S.C. § 7511a(b)(2). The language of 42 U.S.C. § 7502(c) similarly provides that the "state shall submit" a plan that "shall provide for the implementation of" emission reduction requirements including "at a minimum, of reasonably available control technology…" There is no meaning full difference in this mandatory language. The operative provisions are the same. As 42 U.S.C. § 7511a(b)(2) shows clear Congressional intent to require RACT limits before redesignation, *Wall*, 265 F.3d at 440, so too § 7502(c)(1) shows the same intent to require RACT before redesignation in this case. In fact, if there were any doubt that the holding in *Wall* applies in this case, it is resolved by the fact that the statute interpreted in *Wall* specifically states that RACT is required under "section 7502(c)(1)"—the statute section at issue in this case. 42 U.S.C. § 7511a(b)(2). That is, both sections are imposing the same RACT requirement.

This Court's decision in *Big Rivers* similarly undermines EPA's argument that RACT is not required once an area has ambient monitoring data which shows

it is at least temporarily attaining the ambient air quality standard. In that case, coal-fired power plant owners argued that EPA was required to approve any state implementation plan which attained the NAAQS. The Court found this an "oversimplification" of the Clean Air Act. *Big Rivers*, 523 F.2d at 20. The Court further held that because the plain language of the Clean Air Act required SIPs to have emission limits if they were feasible, EPA properly rejected a SIP that instead used alternative control strategies, regardless of whether the alternative control strategies obtained the NAAQS. *Id.* at 22.

The Third Circuit also rejected a similar argument in *Delaware Valley Citizens Council for Clean Air*. 932 F.2d at 267. In that case, citizen groups, including the Sierra Club, challenged Pennsylvania's failure to implement required emission reduction measures under the state's nonattainment SIP. Pennsylvania argued that it would be "silly" to implement addition pollution control measures, even if required under the plan, since the state had already attained ambient air quality standards. *Id.* In that case, the EPA joined the citizen groups to argue that Pennsylvania was required "to adopt regulations and take all other appropriate actions necessary to enforce the 'combination of ... measures' referred to in the quoted language from [the state's plan], even if statutory ambient air standards are met at a particular point in time." *Id.* The argument continued:

> As a practical matter, they say, even without considering possible technical deficiencies in Pennsylvania's

> measuring tools or protocols, data indicating statutory standards are met at any point in time are just as likely to have been caused by random fluctuations in the economic cycle acting upon the vagaries of the winds and currents of the atmosphere as by the measures Pennsylvania took under its Plan. The EPA and the Citizens also point out that a satisfactory reading at a particular moment in time does not offer reasonable assurance that the air quality over a region will remain satisfactory in the future.

*Id.*

The issue in *Delaware Valley*, as in this case, was whether the mandatory language requiring minimum implementation plan components for nonattainment areas was negated as soon as the air quality measured below the ambient air standard. EPA argued to the Third Circuit that a temporary compliance with the air quality standard does not negate the requirement to implement emission limits because, absent adoption of such limits, current compliance with minimum air quality standards is not assured to continue.

The *Delaware Valley* court agreed with the EPA and citizens in that case, rejecting the position that EPA now takes in this case. The court held that the plain language of the applicable Pennsylvania implementation plan used mandatory language to describe the required emission reductions. *Id*. at 268. There was no exception to the plan language in that case, just as there is no exception to the RACT requirement in 42 U.S.C. § 7502(c)(1). Absent a specific exception if pollution measurements drop below the air quality standard, Pennsylvania could

not deny its people the additional mandated pollution reductions. *Id.* Similarly here, absent an exemption in 42 U.S.C. § 7502(c)(1), EPA cannot exempt Indiana, Ohio and Kentucky from the requirement to adopt RACT emission limits before redesignating the Cincinnati area.

Further undermining EPA's argument in this case—that compliance with the ambient air standard, alone, is sufficient to waive required adoption of air pollution limitations before redesignation can be approved—is the fact that EPA has historically eschewed that interpretation. In 1988 EPA rejected redesignating Green Bay, Wisconsin, even though the ambient monitoring data showed attainment , because the state had not yet incorporated emission limits for various pollution sources into the Wisconsin implementation plan. 53 Fed. Reg. 34,791 (Sept. 8, 1988). Similarly, in 1996 EPA refused to redesignate Pittsburgh to attainment after Pittsburg showed ambient air quality below the applicable air quality standard because Pennsylvania had not adopted RACT emission limits, among other rules, into its implementation plan. 61 Fed. Reg. 19,193, 19,196 (May 1, 1996). Notably, EPA based its 1996 refusal to redesignate Pittsburg due to missing RACT limits on the same provisions of 42 U.S.C. § 7407(d)(3)(E) that Sierra Club argues prohibited EPA's opposite decision to redesignate the Cincinnati-Hamilton area in this case. *Id.* EPA was right in 1988 and 1996; it is wrong to interpret the Clean Air Act differently now.

EPA also cites to its Clean Data Determination regulation. 76 Fed. Reg. at 80,258. Sierra Club is not challenging EPA's Clean Data Determination for the Cincinnati-Hamilton nonattainment area. Sierra Club is challenging the redesignation of the area to attainment. A Clean Data Determination, which has no statutory basis, only requires consideration of one criteria: are the ambient monitoring data below the ambient air quality standard. In contrast, the redesignation requires consideration of five criteria, including whether there is a fully approved SIP.

Finally, to the extent that EPA relied on 40 C.F.R. § 51.1010(b) for support when determining that RACT is not required, 76 Fed. Reg. at 80,258, EPA erred. That regulation was struck down in *Natural Resources Defense Council v. EPA*, 706 F.3d at 437. Therefore, that regulation cannot provide a legal justification of EPA's position.

## CONCLUSION

For the foregoing reasons, the Court should vacate EPA's redesignation of the Ohio, Indiana and Kentucky portions of the 1997 annual PM2.5 Cincinnati-Hamilton nonattainment area to attainment.

Respectfully submitted,

/s Robert Ukeiley______________
Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

David C. Bender
Christa O. Westerberg
McGillivray Westerberg & Bender LLC

211 S. Paterson Street, Suite 320
Madison, WI 53703
Tel. 608.310.3560
Email: bender@mwbattorneys.com
westerberg@mwbattorneys.com

Counsel for Sierra Club

Dated: June 28, 2013

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(B), the foregoing Brief contains 9,383 words, as counted by counsel's word processing system.

/s  Robert Ukeiley______________

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

Counsel for Sierra Club

Dated: June 28, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2013 I electronically filed the foregoing Appellants' Brief with the Clerk of the Court using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s Robert Ukeiley______________

Robert Ukeiley

Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

Counsel for Sierra Club

# ATTACHMENT 1

**UNITED STATES DISTRICT COURT**
**OF APPEALS FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB | ) | |
| Petitioner, | ) | |
| v. | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and | ) | **DECLARATION OF NACHY KANFER IN SUPPORT OF PETITION FOR REVIEW** |
| ROBERT PERCIASEPE, Acting Administrator, United States Environmental Protection Agency, | ) | Docket No. 12-3169 *et al.*, |
| Respondents. | ) | |

I, Nachy Kanfer, hereby declare and state as follows:

1. I am the Deputy Director, Central Region for the Beyond Coal Campaign ("Campaign"). The Campaign is a project of the Sierra Club, a non-profit organization under the laws of the State of California. I am responsible for overseeing the Campaign's operations in several Midwest states, including Ohio, Indiana and Kentucky. I live in Columbus, Ohio. The following information is within my personal knowledge.

2. The Sierra Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity in the protection and restoration of the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club members are greatly concerned about air quality, and the Club has a long history of involvement in air quality-related activities on both the local and national levels.

3. I have been working at the Sierra Club since May 2008. In my capacity, I am responsible for directing the activities of the Beyond Coal Campaign throughout the Midwest. These activities include community outreach, public education, legislative lobbying, and litigation. In order to perform the responsibilities of my job, my staff and I interact on a daily basis with the Sierra Club's members in Ohio, Indiana and Kentucky. Because of my position and responsibilities, and through my regular interaction with members, I am familiar with the Sierra Club's purpose, organization, and activities, and with the environmental interests and concerns of Sierra Club members.

4. Sierra Club has expended its resources addressing air pollution issues, including issues relating to fine particulate matter and the enforcement of the 1997 fine particulate matter National Ambient Air Quality Standard. For example, Sierra Club has sought to inform the

public about the health impacts of particulate matter pollution. We regularly advocate for strong implementation of the 1997 fine particulate matter National Ambient Air Quality Standard. We also use information that is produced through monitoring and reporting of air pollution to inform ourselves and our members about pollution.

5. I am familiar with the nature and scope of Sierra Club's membership programs, its membership records, and the manner in which information on members can be retrieved. Sierra Club regularly maintains membership records that include the address of each member. These records are regularly updated to add new members, reflect address changes, and remove the names of persons who are no longer members. The records are maintained on a computer database, from which I obtained and verified on June 27, 2013, the information provided below.

6. Sierra Club presently has more than 595,000 members nationwide. Members reside in each of the 50 states of the United States, as well as the District of Columbia and Puerto Rico, and several U.S. territories.

7. The following number of Sierra Club members also reside in each of the following states: Indiana (7,369), Kentucky (4,720), and Ohio (16,931).

8. The following number of Sierra Club members reside in the following Ohio counties: Butler (401), Clermont (284), Hamilton (1,947), and Warren (247).

9. 61 Sierra Club members reside in Dearborn County, Indiana.

10. The following number of Sierra Club members reside in the following Kentucky counties: Boone (113), Campbell (142), and Kenton (247).

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2013.

[signature]

Nahaliel "Nachy" Kanfer

# ATTACHMENT 2

**UNITED STATES DISTRICT COURT**
**OF APPEALS FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB | ) | |
| Petitioner, | ) | |
| v. | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and | ) | **DECLARATION OF MARILYN WALL IN SUPPORT OF PETITION FOR REVIEW** |
| ROBERT PERCIASEPE, Acting Administrator, United States Environmental Protection Agency, | ) | Docket No. 12-3169 *et al.*, |
| Respondents. | ) | |

I, Marilyn Wall, do declare as follows:

1. My name is Marilyn Wall. I am over 18 years of age. The information in this declaration is based on my personal knowledge or public information in government records and, if called to testify, I would testify as to the facts stated in this declaration.

2. I am a lifetime member of the Sierra Club. I have been a Sierra Club Member since 1978. I serve as the local Conservation Chair of the Sierra Club, where I am involved in community organizing, transportation, air quality, and water quality issues.

3. I live in Hamilton County, Ohio. My current address is 816 Van Nes Dr., Cincinnati, OH 45246. I have lived at this address since 1992 and in Hamilton County since 1967.

4. I enjoy engaging in outdoor activities such as canoeing, kayaking and stand-up paddle boarding. I engage in these activities throughout Hamilton County and the surrounding area, including in the Ohio River, Winton Lake, the Little Miami River, and the Great Miami River. I intend to participate in these activities on a regular basis in the future.

5. At times I experience respiratory symptoms such as irritation, chest congestion, and throat soreness.

6. I use a number of sources to inform myself about air pollution, including the Hamilton County Department of Environmental Services and various Cincinnati, OH news outlets.

7. When I learn that pollution levels in my area are elevated, I become concerned about the effect that this pollution will have on my health and the respiratory symptoms I sometimes experience. I also become frustrated that I live in an area with excessive pollution, and that not enough is being done to remedy that pollution.

8. I understand that on December 14, 2011 EPA redesignated the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter nonattainment area to attainment.

9. In understand that the Cincinnati-Hamilton nonattainment area includes Hamilton County, Ohio where I live.

10. I understand that EPA has determined, based on scientific evidence, that exposure to fine particulate matter causes numerous human respiratory problems, including decreased lung function, asthma, and bronchitis, and is also associated with premature mortality, hospital admissions, cardiopulmonary disease, and lung cancer. I also understand that fine particulate pollution contributes to regional haze, thereby contributing to the visibility range limitations in some of our Nation's most treasured natural areas.

11. I am able to see the effects of particulate matter pollution and regional haze in the Cincinnati area, and I find them aesthetically displeasing.

12. I understand that areas designated nonattainment for a pollutant such as fine particulate matter must take certain steps to remedy that pollution. If an area is improperly redesignated, that results in more air pollution emitted and breathed by nonattainment area residents such as myself.

13. I understand that if the court were to vacate the redesignation of the Cincinnati-Hamilton nonattainment area, it will more quickly reduce the amount of pollution in the air I breathe. This will make it safer for me to pursue the outdoor activities described above, which I enjoy and will continue to pursue. Finally, this will likely provide me with additional benefits in terms of pollution reductions, certainty that I am not exposed to illegal amounts of fine particulate matter pollution, and information about particulate matter pollution and the steps taken to reduce it.

14. I understand that on January 15, 2013, EPA lowered the annual fine particulate matter national ambient air quality standard down to 12 micrograms per cubic meter. See 78 Fed. Reg. 3086 (Jan. 15, 2013).

15. I have reviewed the ambient monitoring data for fine particulate matter for the Cincinnati area which is available here: http://www.epa.gov/airdata/ad_rep_mon.html and http://www.epa.gov/ttn/analysis/dvreview.htm Table 1a. Both of these sources of data from EPA confirm that the Cincinnati area is currently violating the current annual fine particulate matter ambient air quality standard.

16. Yet, as far as I know, no regulatory actions are currently being taken to specifically reduce the level of fine particulate matter in the Cincinnati area. Past experience has shown that it is likely that it will be several years before any emission reductions designed to implement the 2013 fine particulate matter ambient air quality standard will actually take place.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2013.

Marilyn Wall

__________________________

Marilyn Wall