**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB<br><br>Petitioner,<br><br>v.<br><br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and GINA MCCARTHY, Administrator, United States Environmental Protection Agency,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Nos. 12-3169, 12-3182, and 12-3240 |

# PETITIONER'S REPLY BRIEF


LAW OFFICE OF ROBERT UKEILEY
Robert Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-502
rukeiley@igc.org

MCGILLIVRAY WESTERBERG & BENDER LLC
David C. Bender
Christa O. Westerberg
211 S. Paterson Street, Suite 320
Madison, WI 53703
Tel. 608.310.3560

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... iii

I. INTRODUCTION .......... 1

II. RESPONSE TO CERTAIN EPA AND INTERVENOR FACTS .......... 5

III. SIERRA CLUB HAS STANDING .......... 8

IV. REDUCTIONS MADE PURSUANT TO CAP AND TRADE PROGRAMS ARE NOT PERMANENT AND ENFORCEABLE .......... 10

A. EPA's Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii) Fails Under Chevron Step One .......... 10

B. EPA's Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii) Also Fails Under Chevron Step Two .......... 13

C. EPA and Intervenors' Examples of Permanent and Enforceable Reductions Cannot Support A Finding that Cap and Trade Reductions Are Permanent and Enforceable .......... 14

D. EPA's Past Actions and Guidance Cannot Save its Flawed Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii) .......... 14

E. EPA's Brief Makes False Claims About Cap and Trade Programs Reducing Emissions "Upwind" of Metro-Cincinnati .......... 18

F. EPA's Failure to Respond to the Temporal Problems with Cap and Trade Programs Is Fatal .......... 19

G. EPA's Business Case Argument Fails .......... 20

H. EPA's Facile Attempt to Distinguish *NRDC* Lacks Merit .......... 21

I. EPA's Transportation Control Measure Argument is Illegal and Flawed .......... 22

V. EPA'S FAILURE TO APPROVE RACT MEANS THAT EPA CANNOT APPROVE REDESIGNATION .......... 23

VI. NEW ARGUMENTS CANNOT BE THE BASIS FOR UPHOLDING EPA'S ACTION AND ALSO LACK MERIT .......... 25

VII. CONCLUSION .......... 29

CERTIFICATE REGARDING WORD LIMIT .......... 30

CERTIFICATE OF SERVICE .......... 31

## TABLE OF AUTHORITIES

**Cases**


*Catawba County v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ....................................................................3

*Hudson v. Reno*,
130 F.3d 1193 (6th Cir. 1997)...............................................................2, 11

*Michigan v. Thomas*,
805 F.2d 176 (6th Cir. 1986 ) ..................................................................28

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008) .................................................6, 16, 17, 19

*NRDC v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009) ..............................................................21

*Perrin v. United States*,
444 U.S. 37 (1979) ..................................................................................11

*United States v. Jones*,
542 F.2d 661 (6th Cir. 1976) ......................................................................2

*Wall v. EPA*,
265 F.3d 426 (6th Cir. 2001) .................................................23, 24, 25


**Federal Statutes**


42 U.S.C. § 7407(d)(3)(E) .........................................................*passim*

42 U.S.C. § 7410(a)(2)(A) ......................................................................12

42 U.S.C. § 7410(a)(2)(D) ......................................................................17

42 U.S.C. § 7502(c)(1) ............................................................................24

42 U.S.C. § 7502(c)(6) ....................12

42 U.S.C. § 7511a(b)(2) ....................23, 24, 25

42 U.S.C. § 7511a(c) ....................23

42 U.S.C. § 7511a(d) ....................23

42 U.S.C. § 7511a(e) ....................23

**Federal Register**

70 Fed. Reg. 25,162, 25,175 (May 12, 2005) ....................5

76 Fed. Reg. 65,458, 65,461-65 (Oct. 21, 2011) ....................3, 20, 22

76 Fed. Reg. 80,253, 80,258 (Dec. 23, 2011) ....................6, 18

77 Fed. Reg. 9304, 9407 (Feb. 16, 2012) ....................14

78 Fed. Reg. 34,178, 34,191 (June 6, 2013) ....................28

**Other**

Fed.R.App.P 43(c)(2) ....................1

## I. INTRODUCTION

Respondent United States Environmental Protection Agency and its current Administrator Gina McCarthy[1] (EPA) nicely summarize the dispute in this case. EPA contends that "this case begins and ends with the Area's attainment of the 1997 NAAQS, about which there can be no meaningful dispute." Respondent's Brief (EPA Br.) at 6.[2] However, the Clean Air Act provides five factors, all of which must be met, in order for an area to be redesignated from nonattainment to attainment. 42 U.S.C. § 7407(d)(3)(E)(i) – (v). The first factor is whether the area as attained the NAAQS. 42 U.S.C. § 7407(d)(3)(E)(i). EPA's arguments boil down to urging the Court to ignore the other four factors set out in the plain language of the statute.

Sierra Club, on the other hand, urges the Court to overturn EPA's redesignation because it violated two of the other factors. First, EPA violated 42 U.S.C. § 7407(d)(3)(E)(iii) because it approved the redesignation even though the improvements in air quality were due to emission reductions governed by cap and

---

[1] Pursuant to Fed.R.App.P 43(c)(2), Administrator Gina McCarthy is automatically substituted.

[2] It is revealing that even in the regulatory background section of its brief, EPA acknowledges only two criteria for redesignation: attaining the NAAQS and having a maintenance plan. EPA Br. at 9-10 ("Accordingly, Congress provided for the redesignation of an area from "nonattainment" to "attainment" status once the area has attained that particular NAAQS and submitted an approvable plan for maintaining air quality at or below the NAAQS. 42 U.S.C. § 7407(d)(3)(E)."). Elsewhere in its brief, EPA does acknowledge that there are, in fact, five factors. EPA Br. at 10-11.

trade programs, which can increase at any time, rather than due to permanent and enforceable reductions as required by the plain language for the Act. Second, EPA violated 42 U.S.C. § 7407(d)(3)(E)(ii) because EPA approved the redesignation even though EPA had not approved Reasonably Available Control Technology (RACT) emission limits into the SIPs. EPA's attempt to ignore this Congressional requirement, based on EPA's opinion that they are unnecessary, contravenes the law.

The Court's inquiry should begin and end with the plain language of statute. *Hudson v. Reno*, 130 F.3d 1193, 1199 (6th Cir. 1997). Congress decided that there would be five factors that must be met before redesignation can occur. It is not for EPA or the Court to effectively re-write the statute to whittle five criteria down to one. *United States v. Jones*, 542 F.2d 661, 673 (6th Cir. 1976)("It is not for this Court to question the wisdom of Congress and to establish an implied exception to a federal statute by judicial fiat."). Nevertheless, Sierra Club will offer three reasons why it is important for the Court to honor Congress' choice of including multiple factors in the requirement for redesignation.

First, ambient monitors are a very limited gauge of air quality. When EPA and Intervenors say (repeatedly) that Metro-Cincinnati has attained the 1997 annual PM2.5 NAAQS, what they mean is that 14 ambient monitors in Metro-Cincinnati nonattainment area did not measure violations of the 1997 annual

PM2.5 NAAQS in 2007-2009. However, there is “a problem inherent in the monitoring process, namely, that a monitor only measurers air quality in its immediate vicinity.” *Catawba County v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009). The nonattainment area is hundreds of square miles and the monitors sit on parcels that, altogether, comprise a tiny fraction of a square mile. There is simply a lot of area unmonitored. For example, the nonattainment area includes Boone County, Kentucky, which is over 250 square miles but there is no PM2.5 monitor in Boone County. *See* 76 Fed. Reg. 65,458, 65,461 (Oct. 21, 2011). The nonattainment area also includes a portion of Dearborn County, in Indiana, but there are zero PM2.5 monitors in this portion of Dearborn County. *Id.*

The range of pollution values recorded at the 14 monitors is certainly enough that it is completely plausible that within the vast, vast majority of the nonattainment area which is unmonitored, there are areas with pollution exceeding the NAAQS. *Id.* This is especially so in this case because the monitor located at Seymour and Vine in Hamilton County had a three year average of 15.0 microgram per cubic meter (ug/$m^3$) of PM2.5. EPA interprets a violation as 15.1 ug/$m^3$ or greater. Thus, the area was on the brink of nonattainment even based on the tiny portion of the area that is actually monitored.[3] While it may be sufficient

[3] In fact, a monitor at Murray in Hamilton County, Ohio had a three year average of 15.13 ug/m3, which violates the NAAQS. 76 Fed. Reg. at 65,461. EPA, however, did

to meet the first of five redesignation factors to have snuck just below the NAAQS, Congress did not allow these monitoring data to be the "beginning and end" of the inquiry.

Second, air pollution levels below the NAAQS do not mean that people do not get sick from the pollution. Thus, it makes sense for Congress to provide measures to protect public health even if monitors read attainment with the NAAQS. NAAQS are based on the best available science but are required to be reviewed every five years because science advances over time. Specific to PM2.5, although EPA is silent on this point in its brief and Utility Intevenors claim that if the NAAQS is being attained the air quality is protective of human health, EPA and the scientific community agree that there is no threshold below which PM2.5 concentrations are safe. *See* Opening Brief at 9-11. Sierra Club is not arguing here that the PM2.5 NAAQS should be zero. Rather, Sierra Club is just explaining that in light of the dangers of PM2.5, even below the NAAQS, it makes sense for Congress to prescribe requirements beyond just ambient monitors meeting the NAAQS at one point in time for redesignation to attainment. One of these requirements is that all major sources of PM2.5 pollution and precursors comply with Reasonably Available Control Technology emission limits.

---

not consider this value because Ohio stopped operating the Murray monitor before it obtained enough readings to be considered a valid annual average.

Third, EPA and Intervenors make much of contingency measures and the maintenance plan, but at best those plans provide a delayed response to unhealthy air. EPA and the scientific community agree that PM2.5 has irreversible impacts including death. Congress' approach requires a determination that future violations cannot recur because the current, attaining, air quality is guaranteed through permanent and enforceable limits prohibiting emissions to increase, in addition to the "backup plan" of a maintenance plan that kicks in only if dangerous air quality is registered on the limited number of monitors.

## II. RESPONSE TO CERTAIN EPA AND INTERVENOR FACTS

EPA and Intervenors include inaccurate factual claims. Here, Sierra Club responds to the most relevant and most inaccurate of these claims. Additional inaccuracies are explained in sections below or do not merit a response.

EPA claims that "[a]ddressing nonattainment of PM2.5 has therefore been most effectively implemented through controlling sources on a regional basis." EPA Br. at 4. In support of this claim, EPA cites to the regional Clean Air Interstate Rule (CAIR). *Id. citing* 70 Fed. Reg. 25,162, 25,175 (May 12, 2005). EPA does not mention that CAIR was found invalid by the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) specifically because it fails to ensure that it would remove upwind states significant contribution to

nonattainment areas. *North Carolina v. EPA*, 531 F.3d 896, 907-908 (D.C. Cir. 2008), *rehearing granted in part* 550 F.3d 1176 (D.C. Cir. 2008).

EPA also claims that "redesignation to attainment in this case did not relax any emission controls that were in effect." EPA Br. at 5. This is not true. EPA's redesignation replaces the Nonattainment New Source Review program with the less stringent Prevention of Significant Deterioration (PSD) program for new and modified pollution sources. *See e.g.* 76 Fed. Reg. 80,253, 80,258 (Dec. 23, 2011)("PSD requirements will apply after redesignation"); EPA Br. at 35. The nonattainment new source review program is more stringent, that is more protective, than PSD. *See* Intervenors', Buckeye Power, Inc., The Dayton Power and Light Company, Duke Energy Ohio, Inc., FirstEnergy Solutions Corp., Ohio Power Company, and Ohio Electric Valley Corporation, Response Brief (Utility Br.) 3-4. For example, nonattainment NSR requires new major sources to obtain offsets of their emission increases and requires more stringent lowest achievable emission rates (LAER) while PSD only requires less stringent limits. *Id.*

In addition, EPA's brief ignores the fact that there were additional emission controls, such as RACT, which should have been in place before EPA granted redesigntion status and that would have further reduced pollution. By allowing the area to avoid RACT, EPA removed the opportunity to obtain those emission reductions.

Finally, EPA states that EPA determined that improvements in air quality in the Cincinnati area were due, in part, to three cap and trade programs: the NOx SIP Call, the Clean Air Interstate Rule (CAIR) and CSAPR. EPA Br. at 13. This is true. What is also true, but not mentioned by EPA, is that EPA never determined and never claimed that the Cincinnati area would have attained without any of these three programs. Thus, EPA's decision in this case must rise or fall with the legality of using these trading programs, since there are no data and no EPA findings that the area can be redesignated without the impact of the three trading programs.

Utility Intervenors try to claim that Cincinnati would eventually attain even without these programs. This is irrelevant because it was not the basis for EPA's final action and section 107(d)(3)(E)(iii), 42 U.S.C. § 7407(d)(3)(E)(iii), addresses the improvements in air quality that lead to the attainment, not improvements in air quality that may occur in the future. In addition, Utility Intervenors' claim is not supported by the modeling scenarios they point to. The scenario pointed to as showing that attainment will be achieved assumes future pollution reductions that are not required by any law, whereas the scenario that includes only the reductions required by law does not show attainment. Utility App 000339.

## III. SIERRA CLUB HAS STANDING

EPA argues that Sierra Club lacks standing, even though Sierra Club bases its standing on the declaration of Marilyn Wall, who was a plaintiff in another case about redesignation of the Cincinnati area in which this Court reached the merits, thus implicitly finding she had established standing. Undeterred, EPA argues that Sierra Club lacks standing because "all of the controls that led to air quality improvements resulting in attainment, and these or similar controls continue in place in the future." EPA Br. at 32.

EPA's argument is baseless. Even EPA's ally, the Utility Intervenors, explain how redesignation substituted the Prevention of Significant Deterioration (PSD) program for the more stringent Nonattainment New Source Review program. Utility Intervenor Br. at 3-4.[4] Nonattainment New Source Review is an applicable emission control requirement that Sierra Club's members no longer have the protection of.

Additionally, because Ohio and Indiana must adopt RACT emission limits for PM2.5 emissions from major sources of pollution in the nonattainment area before redesignation, those additional pollution reductions reduce the pollution to which Sierra Club members are exposed. EPA's argument that PM2.5 pollution

---

[4] The fact that the Utility Companies incurred significant expense so they could intervene in this case should be a pretty clear indication, in itself, that EPA's claim that there were be no additional emission control requirements if Cincinnati is returned to nonattainment is not meritorious.

reductions through Nonattainment New Source Review and RACT do not address injuries caused by PM2.5 pollution is illogical. EPA's own position outside of this litigation is that all reductions in PM2.5 provide health benefits because there is no safe level of PM2.5. *See* Opening Brief at 9-11.

Ensuring that emission reductions to date, which EPA alleges resulted in Metro-Cincinnati attaining the 1997 standard, are permanent and enforceable, as opposed to the risk that emissions will increase because of different future utility trading decisions under the NOx SIP Call, CAIR and CSAPR's cap and trade program, reduces risks for Sierra Club members. It is not "entirely speculative" that polluters allowed the flexibility to increase future emissions due to the flexibility afforded in trading programs may use that flexibility. In fact, EPA's trading programs are premised upon and seek to afford that very flexibility. EPA's standing argument is really just a variation of its arguments on the merits.

Contrary to EPA's false speculation, the "real relief" Sierra Club seeks in these cases is an order vacating EPA's current redesignation order and requiring EPA to comply with all five factors in section 107(d)(3)(E), 42 U.S.C. § 7407(d)(3)(E), before redesignating Metro-Cincinnati to attainment for the 1997 PM2.5 NAAQS. Such an order would provide less PM2.5 exposure for Sierra Club members who are exposed to PM2.5 pollution, which can kill them. Being denied increased pollution protection from Nonattainment New Source Review and

PM2.5 RACT limits is an injury traceable to EPA's illegal actions being challenged in this case which this Court can remedy. Thus, Sierra Club has standing.

## IV. REDUCTIONS MADE PURSUANT TO CAP AND TRADE PROGRAMS ARE NOT PERMANENT AND ENFORCEABLE

EPA's argument on appeal, which it did not articulate in the final rules, is that 42 U.S.C. § 7407(d)(3)(E)(iii) requires that "improvements in air quality that occurred prior to redesignation and that led to attainment are due to permanent and enforceable emission reductions, *e.g.*, regulations that will continue in the future." EPA Br. at 12. This statutory interpretation fails.

### A. EPA's Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii) Fails Under Chevron Step One.

EPA argues that the terms "permanent" and "enforceable" are ambiguous because the statute does not include a definition for each, and does not say that cap and trade programs do not create permanent and enforceable reductions. EPA Br. at 36-37. But the issue in this case is not the definition of "permanent and enforceable"—it is that EPA applied those adjectives to the wrong noun. The statute does not require that the <u>regulations</u> be "permanent and enforceable," it requires that there be "permanent and enforceable <u>reductions in emissions</u>[.]" 42 U.S.C. § 7407(d)(3)(E)(iii) (emphasis added). Even if the NOx SIP Call, CAIR, and CSAPR were permanent (which they are not since they have been replaced,

remanded or vacated), they allow flexibility in emission rates so that any reduction in emissions one year is neither permanent nor enforceable because the source can buy the right to pollute more the next year.  EPA's interpretation, which tries to re-write the statute by saying "permanent and enforceable regulation," instead of "permanent and enforceable reductions in emissions," fails under Chevron Step One because Congress' plain language requires the  "reductions in emissions" to be "permanent and enforceable."  Historic voluntary reductions that could be reversed at any time by pollution sources deciding to buy more allowances and pollute more are not "permanent and enforceable."  EPA attempts to hide the ball by pretending that the dispute is the definition of "permanent and enforceable," but ignoring the actual issue which is that the reductions, not the regulations, need to be permanent and enforceable.

Even if the issue was actually the definition of permanent and enforceable, "'words will be interpreted as taking their ordinary, contemporary, common meaning…'"  *Hudson*, 130 F.3d at 1199 (quoting *Perrin v. United States,* 444 U.S. 37, 42, …(1979)).  EPA's interpretation runs against the ordinary, contemporary, common meaning of permanent and enforceable and thus fails under Chevron Step One.

EPA's interpretation is that "permanent and enforceable reduction in emissions resulting from… regulations" 42 U.S.C. § 7407(d)(3)(E)(iii), means as

long as any regulation will continue in the future, any reductions attributable to that regulation are also permanent and enforceable even when the regulation does not actually require any emission reductions in the future. EPA Br. at 12. EPA's interpretation, literally, is that "permanent and enforceable emission reductions" does not require reductions that are permanent and enforceable. This is untenable.

EPA also cites to 42 U.S.C. §§ 7410(a)(2)(A) and 7502(c)(6) to support its statutory interpretation that cap and trade programs should be considered permanent and enforceable emission reduction. EPA Br. at 43. However, those sections support Sierra Club's position. In both sections, Congress included "marketable permits," which is a term encompassing the cap and trade concept, in the definition of "other control measures, means or techniques," rather than in the definition of "enforceable emission limits." 42 U.S.C. §§ 7410(a)(2)(A); 7502(c)(6). In other words, Congress has clearly indicated that "marketable permits" (*i.e.*, emission trading) is something other than "enforceable emission limitations." *Id.* That is Sierra Club's point: 42 U.S.C. § 7407(d)(3)(E)(iii) requires enforceable emission reductions, not other "other control measures, means or techniques."

## B. EPA's Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii) Also Fails Under Chevron Step Two.

Although unnecessary because this case is resolved under Chevron Step One, Sierra Club notes that EPA's interpretation would also fail under Chevron Step Two. The fact that a regulation will continue in the future has no bearing on whether an area will continue to attain the NAAQS. It is the emission reductions that brought the area into attainment and it is the emission reductions which will keep the area in attainment. The mere existence of a regulation, without an enforceable reduction, does nothing. Unless a regulation mandates the necessary reductions sufficient to maintain air pollution below the NAAQS, equating emission reductions and regulations is unreasonable.

As an illustrative example: A regulation says a power plant can emit 1000 tons of PM2.5 pollution per year, an analysis shows that pollution above 500 tons causes NAAQS violations, but the power plant emits only 200 tons during the year that nonattainment area finally attains the NAAQS. The attainment was due to the reduction and not the regulation. The regulation does not ensure attainment of the NAAQS. Yet, under EPA's interpretation, the fact of the regulation alone satisfies 42 U.S.C. § 7407(d)(3)(E)(iii). This makes no sense and so would fail under Chevron Step Two.

### C. EPA and Intervenors' Examples of Permanent and Enforceable Reductions Cannot Support A Finding that Cap and Trade Reductions Are Permanent and Enforceable.

Interestingly, EPA actually recognizes the difference between transitory reductions due to regional trading programs and enforceable reductions in the amounts and from the plants actually contributing pollution to the Metro-Cincinnati airshed. In a footnote, EPA explains that two units now have air pollution control permits that actually prohibit those units' emissions from increasing above levels in recent attainment years. EPA Br. at 43, ftnt. 14. But, those are the only two with such limits. The statute does not say that it is enough for a small minority of reductions to be permanent and enforceable—all the emission reductions responsible for the decrease in air pollution below the NAAQS must be enforceable.

Similarly, it is irrelevant that future effective regulations like the Mercury and Air Toxics rule (MATS). Utilities Br. at 13;*see* 77 Fed. Reg. 9304, 9407 (Feb. 16, 2012)(compliance date no sooner than March 2015). Plus, the Court must decide this case on the basis EPA provided for its decision, not a *post hoc* alternative rational supplied by Intervenors' counsel.

### D. EPA's Past Actions and Guidance Cannot Save its Flawed Interpretation of 42 U.S.C. § 7407(d)(3)(E)(iii)

EPA points out that it has issued other final rules, which no court has passed on, in which it said that emission reductions in a particular year made pursuant to cap and trade programs are permanent and enforceable. EPA Br. at 39. However, an interpretation that re-writes the plain language or runs counter to the ordinary meaning of the statute does not survive Chevron Step One simply because EPA has made the interpretation before. Nor does it survive Chevron Step Two if it makes no sense.

EPA cites its General Preamble as providing support for its position. EPA Br. at 19. However, the language EPA quotes highlights Sierra Club's point. The General Preamble saying: "A regulatory **limit** is not enforceable if, for example, it is impractical to determine compliance with the published **limit**." EPA Br. at 19 (emphasis added). The word "limit" is key. Under a cap and trade program, sources pollute as little or as much as they want in any given year based on how many pollution credits they have, not based on any limit. There is no requirement limiting pollution from plants whose past pollution reductions allowed Cincinnati to come into compliance with the NAAQS do not pollute at a higher level. That is, there is no "limit."

The same analysis applies to EPA's citation of the General Preamble that says enforceability means "[m]easures are enforceable when they . . . specify clear, unambiguous, and measurable requirements." EPA Br. at 38. Under cap and trade

programs, there are no requirements that the specific sources impacting the Cincinnati nonattainment area make emission reductions. The fact that there is no requirement to make emission reductions means that the cap and trade program is not enforceable as required by 42 U.S.C. § 7407(d)(3)(E)(iii).

EPA also says that its General Preamble explained that "temporary reductions" do not meet the requirements of § 7407(d)(3)(E)(iii). EPA Br. at 18-19. EPA explains that changes in emissions due to changes in economic activity are temporary reductions. *Id.* at 19. However, EPA ignores that reductions occurring from any particular plant under a cap and trade program are, by definition, due to past business decisions based on economic activity. The premise of trading programs, as opposed to programs that dictate specific pollution reductions from specific plants, is to provide flexibility to each plant to increase or decrease pollution at anytime, as long as it buys an allowance for each unit of pollution. Emissions are only reduced if the market price for an allowance exceeds the incremental cost to reduce pollution; if the price of an allowance drops or the incremental cost to control the next unit of pollution increases, the emissions from a plant will increase. Thus emission reductions pursuant to cap and trade programs are a type of temporary change in economic activity.

This conflict between the flexibility provided by multi-airshed pollution trading programs and the need to have specific plants reduce pollution by specific

amounts to bring a specific airshed into compliance with air quality standards is what has doomed CAIR. In the *North Carolina v. EPA* case, the D.C. Circuit reversed EPA's attempt to substitute multi-state trading for reductions from upwind states that must be reduced to avoid contribution to specific downwind states' nonattainment area airsheds. 531 F.3d 896, 907 (D.C. Cir. 2008). The statute in *North Carolina*, like the statute here, required a connection between specific emission reductions from upwind plants and air quality improvements in a particular nonattainment area. *Compare* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (requiring prohibition on emissions from one state in amounts that contribute to nonattainment in a downwind state) *with* 7407(d)(3)(E)(iii) (requiring that reductions in emissions that lead to the drop in pollutant concentrations in the nonattainment area to be permanent and enforceable reductions). *North Carolina* held that EPA's predictions of improvements downwind based on economic choices in a trading program to be insufficient because trading programs fail to permanently eliminate the amount of emissions that contributed to nonattainment from specific sources to pollution in specific nonattainment areas. *Id*. at 908. So too here: trading programs do not require that the plants upwind from Metro Cincinnati maintain the reductions that occurred in 2009 and lead to attainment. Rather, those plants area allowed under all three trading programs to increase pollution by simply obtaining credit from someone else, regardless of whether they

are outside the Metro Cincinnati airshed, or using "banked" allowances from years ago.

### E. EPA's Brief Makes False Claims About Cap and Trade Programs Reducing Emissions "Upwind" of Metro-Cincinnati.

EPA's brief claims that in the final redesignation rules, "EPA explained that these federal [cap and trade] regulations required emission reductions in NOx and $SO_2$ from sources in and upwind of the Area and remain in place following redesignation. *Id*. at 80,255-56 (OH and IN); 76 Fed. Reg. at 77,906 (KY)." EPA Br. at 24. *See also Id*. at 23 (also falsely claiming that "upwind" states will continue to have emission reductions.); *Id.* at 41 (same). This is not true. First, EPA's brief does not specify what it considers to be "upwind" from Metro-Cincinnati, but it cannot mean the entire eastern half of the United States that is covered by the NOx SIP Call and CAIR. It is unlikely it even contends that the entirety of the states of Ohio, Indiana, and Kentucky are upwind from Cincinnati. Moreover, EPA's brief cites nothing for its assertion. The final redesignation rules did not say, or even attempt to determine whether, the emission reductions required under the NOx SIP Call, CAIR and CSAPR were upwind, downwind or in wholly separate airsheds from Metro-Cincinnati. 76 Fed.Reg. at 80,255-56 (OH and IN); 76 Fed. Reg. at 77,906 (KY).

Moreover, EPA could not have actually done what its' brief claims was done; it is not even be possible. Under a cap and trade program, emission rates

from individual sources change and are expected to. That is the primary benefit of cap and trade programs: they provide significant "flexibility" to individual sources to pollute as much or as little as they chose to pollute at any given time based on market forces, speculation, and hedging decisions. But it is exactly this flexibility that EPA seeks to provide in cap and trade programs that runs directly counter to § 7407(d)(3)(E)(iii)'s mandate that the emission reductions from the specific sources that used to cause the area to violate the standard, but since have been reduced, never increase again.

### F. EPA'S Failure to Respond to the Temporal Problems with Cap and Trade Is Fatal.

In its opposition brief, EPA fails to offer a response to the temporal aspect of the problem. *See generally North Carolina v. EPA*, 531 F.3d at 912 (discussing CAIR's pollution credit "banking" aspect). Rather, EPA makes statements like "increases in emissions at any one unit generally must be offset by further decreases in emissions at other units." EPA Br. at 49. This statement is untrue because banking actually allows decreases in emissions one year to be offset by increases in emissions in future years. At other points, EPA acknowledges that there is "some flexibility" when it comes to the timing of emission reductions but offers no response on this issue. EPA Br. at 50.

As Sierra Club explained in its opening brief, one of the problems with reliance on cap and trade reductions is they allow emission banking and later

increases. *See e.g.* Opening Br. at 14. That is, emissions are not "reduced," they are merely postponed. EPA does not address this problem at all.

**G. EPA'S Business Case Argument Fails.**

EPA goes on to make its "business case" for why pollutors subject to cap and trade will not increase their emissions, even though they are allowed to under the cap and trade programs. EPA Br. at 42-43. Sierra Club has already rebutted these arguments. *See* Opening Br. at 30-31.

As an example of the problem, the W.H. Zimmer power plant is one of the largest sources of pollution in the Metro-Cincinnati nonattainment area. EPA relied on reductions in NOx pollution Zimmer made between 2005 and 2009 as part of its finding under § 7407(d)(3)(E)(iii). *See* 76 Fed. Reg. 65,458, 65,464-65 (Oct. 21, 2011).

In 2009, Zimmer's NOx emissions were 3,646.4 tons at an emission rate of 0.11 pounds of NOx per million British thermal unit (lb/mmbtu) of heat input. AR VI.58.[5] In every subsequent year, that is 2010, 2011, and 2012, NOx emission from Zimmer, both in total annual tons and in the emission rate, were substantially higher. The totally emissions, in tons per year were 7,925.8, 8,438.5 and 6,574.8 for 2010, 2011, and 2012 respectively. *Id.* The emission rates were 0.18, 0.26 and 0.29 lb/mmbtu in 2010, 2011, and 2012 respectively. *Id.* The dramatic increase in

[5] Pages 5-7 of the Addendum to Intervenor State of Ohio's brief explains how to access the information in AR 58, the Clean Air Markets Database.

the Zimmer NOx emission rate after the "attainment" year, that is 2009, can only be explained by operators of Zimmer choosing to operate the NOx emissions controls, that is the selective catalytic reduction unit, less.

Utility Intervenors only discuss the $SO_2$ emission controls from Zimmer. *See* Utility Br. at 19. This discussion of $SO_2$ emission controls is misleading because controls are adjustable, even if not bypass-able. However, the Court need not address this issue. The point is not whether emissions did increase after 2009, the fact that they can (as evidenced by the NOx increases) means that the full reduction between 2005 and 2009 was not "permanent and enforceable."

### H. EPA'S Attempt to Distinguish *NRDC* Lacks Merit

EPA tries to distinguish *NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009) by pointing out that RACT only applies within the nonattainment area but section § 7407(d)(3)(E)(iii) do not. EPA Br. at 45-46. This is true, but as Sierra Club pointed out in its opening brief, § 7407(d)(3)(E)(iii) is also geographically limited because the relevant emission reductions must be from one of the pollution sources that contributed to the nonattainment but which subsequently reduced emissions and contributed to the current attainment status. EPA did not, does not, and cannot establish that the each and every source of pollution in 22 states plus D.C. covered by the NOx SIP Call, the 28 states plus DC covered by CAIR or the 28 states covered by CSAPR, which includes states as far away as Texas and Florida, made

emission reductions to which the improvements in air quality in Metro-Cincinnati are "due." In fact, EPA specifically only looked at 11 of these states and in doing so, acknowledged that one of the states, Missouri, saw in increase in $SO_2$ emissions during the time frame of EPA's analysis. 76 Fed. Reg. at 65,466. Thus, EPA's distinction between the geographic limitation of RACT and the geographic limitation of section §7407(d)(3)(E)(iii) fails. It is for this same reason that EPA's attempted reliance on the 22 or 28 state "cap" fails. *See* EPA Br. at 49.

## I. EPA'S Transportation Control Measure Argument is Illegal and Flawed.

EPA points out that transportation control measures, which EPA also relied upon in its Criteria 3 analysis, allow flexibility of emissions over time and space, depending upon vehicle usage and business operations. EPA Br. at 51-52. To begin, Sierra Club did not object to these provisions so they are not at issue in this case. More importantly, these measures do not have the same flaw that Sierra Club complains about for the NOx SIP Call, CAIR and CSAPR.

For example, in its Criteria Three analysis, EPA relied on the Tier 2 vehicle standards. 76 Fed. Reg. at 65,465. This standard imposes a 30 parts per million sulfur content limit on gasoline starting in January of 2006. *Id.* This 30 parts per million (ppm) standard is enforceable and permanent actual limit which applies to every gasoline car in and near the Cincinnati nonattainment area. It is because the sulfur in gasoline was lower to the level required by law that there were emission

reductions from mobile sources and the 30 ppm limit will remain in place on a permanent basis. Individual drivers in Metro-Cincinnati cannot chose to use 45 ppm gasoline if they can get a drive in Oklahoma to use 15 ppm gasoline. EPA also relied on a 15 ppm sulfur limit in diesel which began in 2007 which is similarly an actual limitation that applies to all diesel vehicles in and near the nonattainment area. *Id.* In contrast to the cap and trade programs for power plants imposes no actual emission limit.

## V. EPA'S FAILURE TO APPROVE RACT MEANS THAT EPA CANNOT APPROVE REDESIGNATION.

EPA's redesignation violated §7407(d)(3)(E)(ii) because EPA had not approved PM2.5 RACT requirements into the SIP. EPA tries to distinguish the controlling precedent, *Wall v. EPA*, 265 F.3d 426 (6th Cir. 2001), by explaining that *Wall* involved ozone RACT under section 182(b)(2), 42 U.S.C. § 7511a(b)(2) while this case involves PM2.5 RACT under section 172(c)(1), 42 U.S.C. § 7502(c)(1). EPA Br. at 59.[6] EPA's attempt to distinguish *Wall* fails because it ignores the fact that both statute sections have virtually identical controlling language. Sierra Club has already explained that because the two sections use essentially the same relevant language, and because this Court found the language

[6] EPA incorrectly claims that RACT in section 182(b)(2) applies only to moderate ozone nonattainment areas. It also applies to serious, severe and extreme ozone nonattainment areas. *See* 42 U.S.C. §§ 7511a(c), (d), & (e).

to be unambiguous, the distinction does not dictate a different result in this case. *See* Opening Br. at 35.

EPA claims that it is "specific language in section 182(b)(2) regarding the implementation of *ozone* RACT rules" that drove the decision in *Wall*. EPA Br. at 59 (emphasis in original). This is not true. In *Wall*, the Court said:

> "The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology." [42 U.S.C. § 7511a(b)(2)]. By this language, it is clear that Congress intended for SIPs submitted in redesignation requests to include "provisions to require the implementation of" RACT measures.

265 F.3d at 440. Thus, contrary to EPA's claim in its brief, it is actually the <u>language</u> in section § 7511a(b)(2), which does not specificly reference ozone but does include the same key terms as in § 7502(c)(1), which lead the Court to include that its unambiguous nature means that EPA must approve RACT provisions before EPA can redesignate an nonattainment area to attainment. Simply because Congress chose to include parallel requirement in a section devoted to ozone and in the section applicable to PM2.5 here is not relevant. EPA fails to explain why the virtually identical parallel language in both sections related to RACT should or can be interpreted to mean opposite things for PM2.5 and ozone.

The *Wall* decision specifically rejects EPA's principle argument, which the State of Ohio joins in this case. EPA argued then, just as it argues in this case, that

"emissions reductions from RACT measures are not presently needed for attainment and maintenance in Cincinnati[.]" *Wall*, 265 F.3d at 441. *See also* Ohio Br. at 16-17. This Court held that this "justification[] could well support its position if the statute on implementation of the RACT measures were ambiguous, [but] they do not allow the EPA to take a position that conflicts with the clear intention of Congress to require actual provisions[.]" *Id.*

EPA attempts to claims that the *Wall* decision was based on the structure of § 7511a(b). EPA Br. at 59-60. But, the *Wall* decision did not address the provisions that EPA discusses in its brief. *Wall*, 265 F.3d at 440-442. This Court's prior decision in *Wall* cannot be distinguished on the bases EPA asserts. Just because EPA is attempting to apply an interpretation rejected as to ozone in *Wall* to PM2.5 pollution here does not make that interpretation any less illegal.

## VI. NEW ARGUMENTS CANNOT BE THE BASIS FOR UPHOLDING EPA'S ACTION AND ALSO LACK MERIT.

EPA's final argument is that this Court cannot address the issue of CSAPR being struck down because Sierra Club did not raise it in its comments. EPA Br. at 62-63. It is disingenuous for EPA to move this Court three times (so far) to stay this case because of the challenges to CSAPR and to then turn around and tell the Court that CSAPR's status can play no role in the Court's decision. In any event, Sierra Club has made clear that while the Court could overturn EPA's actions

based on the fact that CSAPR is vacated, Sierra Club's arguments are correct regardless of the status of CSAPR. *See* Opening Br. at 25, ftnt. 9.

Utility Intervenors claim: "Of note: modeling also indicates that, even in the absence of CAIR and with nothing replacing it, the area would eventually meet attainment." Utility Br. at 12. This claim is irrelevant as this was not the basis for EPA's final rule. Rather, Utility Intervenors acknowledge that the EPA relied on CAIR and CSAPR as permanent and enforceable emission reductions to meet the third redesignation criteria. *See* Utility Br. at 9. It is also irrelevant because the third criteria requires the permanent and enforceable emission reductions have lead to improvements in ambient air quality, not that other reductions are projected to someday lead to improvements in the future. *See* 42 U.S.C. § 7407(d)(3)(E)(iii).

But, in addition to being irrelevant, this claim by Utility Intervenors is also untrue. To support their claim, Utility Intervenors point to a modeling exercise that was done by the Lake Michigan Air Directors Consortium (LADCO) after CAIR was rejected by the D.C. Circuit. In this analysis, "Scenario B" represents the modeled air pollution levels if legally required emission limits are in place. Utility App 000334. On the other hand, "Scenario C" assumes that various sources will install pollution controls that had not been installed and are not legally required and all sources would run the controls at the maximum level all the time. *Id.* The modeling showed that without CAIR Cincinnati would continue to violate

the NAAQS in 2009 and 2012 under all scenarios. Utility App 000339. The modeling showed that in 2018, under the scenario of what is legally required, "Scenario B," Cincinnati would continue to violate but under the scenario of assumed controls, scenario C, Cincinnati would be at 14.9 ug/m3 versus the NAAQS of 15.0. *Id.*

Utility Intervenors and the State of Ohio also make the argument that Ohio does have RACT for "particulate matter." Utility Br. at 12; Ohio Br. at 5. This argument fails because it was not the basis of EPA's decision. Moreover, this case is about RACT for PM2.5, not coarse particulate matter. The regulations Utility Intervenors discuss were created in 1991, six years before there even was a NAAQS for PM2.5 and therefore obviously not designed to address PM2.5. As all parties acknowledge, PM2.5 is directly emitted but is also formed in the air from precursor chemicals. EPA's final action did not rely on a claim that particulate matter RACT will address PM2.5 because there is no merit to the claim considering the different sources and nature of particulate matter and PM2.5. In addition, if a state submits existing rules as RACT, EPA has to review them to see if they represent current technology or if they are out of date. Utility Intervenors also argue that the NOx SIP Call is RACT for NOx, a PM2.5 precursor, even though the D.C. Circuit has directly rejected that argument.

Utility Intervenors argue that the Selective Catalytic Reduction units on two power plants in Ohio constitute RACT, should the state ultimately require such RACT. Utility Br. at 20-21. Again, this was not the basis for EPA's action so the Court cannot rely on it. Furthermore, RACT is an emission limit, not a control technology that can be turned off or operated at various levels. 78 Fed. Reg. 34,178, 34,191, n.33 (June 6, 2013); *Michigan v. Thomas*, 805 F.2d 176, 180 (6th Cir. 1986). Even if SCR devices could be used to develop RACT, RACT must be a limit that applies and requires operation of the pollution controls at maximum efficiency all of the time. In other words, it is not enough to have a pollution control device, RACT must require that it be turned on and cranked up.

Lastly, the Utility Intervenors argue that because there is an approved maintenance plan and contingency measures, the Sierra Club's arguments are invalid. Utility Intervenor Br. at 13-14. In other words, Utility Intervenors believe that because § 7407(d)(3)(E)(iv) is met, § 7407(d)(3)(E)(ii) & (iii) do not apply. But redesignation requires all five criteria to be met. Congress did not put an "or" between subsections (E)(ii), (iii) and (iv). Additionally, as explained above, a maintenance plan is insufficient because it applies only after air pollution has increased and the air has become unsafe. It shuts the barndoor after the cows are out, but redesignation requires the barndoor to be shut and locked in the first instance.

## VII. CONCLUSION

Therefore, for the reasons explained above and in Sierra Club's Opening Brief, the Court should vacate and remand both rules redesignating Metro-Cincinnati to attainment with instructions to not make another similar redesignation until PM2.5 RACT is in place and EPA can demonstrate that improvements in air quality which lead to attaining the NAAQS in 2007-2009 was due to emission reductions which are now permanent and enforceable.

Respectfully submitted,

/s Robert Ukeiley

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

David C. Bender
Christa O. Westerberg
McGillivray Westerberg & Bender LLC

211 S. Paterson Street, Suite 320
Madison, WI 53703
Tel. 608.310.3560
Email: bender@mwbattorneys.com
westerberg@mwbattorneys.com

Counsel for Sierra Club

Dated: September 16, 2013

**CERTIFICATE REGARDING WORD LIMITATION**

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(B), the foregoing Brief contains 6,965 words, as counted by counsel's word processing system.

/s Robert Ukeiley______________

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

Counsel for Sierra Club

Dated: September 16, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2013 I electronically filed the foregoing Petitioner's Reply Brief with the Clerk of the Court using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s Robert Ukeiley______________

Robert Ukeiley

Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
Tel: (859) 986-5402
E-mail: rukeiley@igc.org

Counsel for Sierra Club